### THE BOWLING GREEN.

### THE SOCONY NO. 175.

### CZARNIKOW—RIONDA CO. et al. v. ELLERMAN & BUCKNALL S. S. CO., Limited, et al.

District Court, E. D. New York.
March 20, 1935.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Richard F. Shaw, both of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, for Ellerman & Bucknall S. S. Co., Limited, and Norton, Lilly & Co.

Purdy & Purdy, of New York City (Frank C. Mason, of New York City, of counsel), for Manhattan Lighterage Corporation, The Bowling Green, and Flower Lighterage Co., Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Standard-Vacuum Transp. Co., and Socony No. 175.

CAMPBELL, District Judge.

This suit was brought by the three libelants against Ellerman & Bucknall Steamship Company, Limited, Ellerman Lines, Limited, Hall Line, Limited, Norton, Lilly & Co., Manhattan Lighterage Corporation, and lighter Bowling Green, to recover the sum of $8,000 for loss or damage to bales of sugar bags lost overboard from the Bowling Green.

The Standard-Vacuum Transportation Company and the lighter Socony No. 175 were impleaded on the petition of the Manhattan Lighterage Corporation, under the 56th Rule in Admiralty (28 USCA following section 723).

The Flower Lighterage Company, Inc., was impleaded on the petition of Ellerman & Bucknall Steamship Company, Limited, under the 56th Rule in Admiralty (28 USCA following section 723).

On the trial the suit was discontinued against Ellerman Lines, Limited, and Hall Line, Limited.

Briefly stated, the facts are as follows:

The cargo in question destined for Cuban ports was shipped at Calcutta, on board the steamship City of Manila, operated by respondent Ellerman & Bucknall Steamship Company, Limited, via New York, under negotiable through bills of lading.

The covering bills of lading provided that the goods should be delivered at New York, to Messrs. Norton, Lilly & Co., agents of the Ellerman & Bucknall Steamship Company, Limited, to be for-

See, also, 6 F. Supp. 924.

warded by them "at ship's expense but at the risk of the owner of the goods to Sagua, Cuba."

The bills of lading also contained the following exceptions and conditions: "Liberty to tranship or land or reship the said goods unto any other steamer or steamers at the steamer's expense is reserved. All and every transhipment to be at merchant's risk."

For a long time past, Norton, Lilly & Co. had had an arrangement with the Flower Lighterage Company, Inc., whereby the Flower Lighterage Company, Inc., agreed to transport cargoes for Norton, Lilly & Co., from Norton, Lilly & Co.'s pier to other points in or about New York harbor.

On the arrival of the goods, Norton, Lilly & Co. notified the Flower Lighterage Company, Inc., which sent among others the lighter Bowling Green owned and operated by the Manhattan Lighterage Corporation, to transport these and other goods to various places in New York harbor.

The sugar bags were loaded and stowed on the lighter Bowling Green by it or those for whom it is responsible.

The Bowling Green with the sugar bags on board was towed to the slip between Piers 64 and 65, North River, where the lighter was made fast over night alongside another lighter, Munson No. 68, lying moored to the bulkhead.

The goods were to be loaded on the steamship Munargo of the Munson Steamship Line, for carriage to Cuba.

It is admitted by the libelant that the cargo was in apparent good order and condition when turned over to the Flower Lighterage Company, Inc., and loaded aboard the Bowling Green, and the delivery book in evidence and other proof shows that to be the fact.

I am convinced that the Manhattan Lighterage Corporation, the lighter Bowling Green, and the Flower Lighterage Company, Inc., in the carriage of the gunnies, were acting as private carriers. This was stipulated by all of the parties to this suit, except the respondents Ellerman & Bucknall Steamship Co., Limited, and Norton, Lilly & Co., and was sustained by the evidence. It is true that the real owners of the cargoes carried were the holders of the bills of lading, but the Flower Lighterage Company, Inc., Manhattan Lighterage Corporation, and the lighter Bowling Green had no contract with such owners but were carrying such cargoes pursuant to an agreement with Norton, Lilly & Co., as agent for Ellerman & Bucknall Steamship Company, Limited, which last-mentioned company was paying the charges of such carrying of the cargoes provided by the provision of the bill of lading reading: "To be forwarded by them * * * at the ship's expense but at the risk of the owner of the goods. * * *"

The only cargo carried by the Flower Lighterage Company, Inc., Manhattan Lighterage Corporation, and lighter Bowling Green, at the time in question was that which was carried under the said agreement between Norton, Lilly & Co. and Flower Lighterage Co., Inc., on the order of said Norton, Lilly & Co., and this did not make them common carriers, but only bailees to transport for hire, and to recover as against them or either of them negligence must be affirmatively shown. The William I. McIlroy (D. C.) 37 F.(2d) 909, affirmed (C. C. A.) 45 F.(2d) 1023; The C. R. Sheffer (C. C. A.) 249 F. 600; The Wildenfels (C. C. A.) 161 F. 864; In re Steamship Co. Norden (D. C.) 6 F.(2d) 883.

The Bowling Green was properly made fast alongside of the Munson No. 68, which was at the bulkhead between Piers No. 64 and 65, North River, at the times in question, where she had a legal right to be.

The Bowling Green was at the times in question a stick lighter 95.5 feet long and 30.6 feet wide, having a scow-type hull with a raked bow and stern and hoisting machinery at the stern within a structure in which there were also living quarters for her captain and mate. She carried a gasoline engine on the starboard side aft for the purpose of pumping out the usual leakage to which all wooden vessels are subject, and from this engine there ran to the starboard side forward and starboard side aft pipe lines, each of which extended down into the hold close to the bottom.

The Bowling Green was overhauled a short time before the accident, to wit, November 25, 1932, and December 10, 1932, and when she left the yard no repairs were required and she was in excellent condition. While she was at the yard repairs had been made to her planking, her four corners and bumper log,

and she was completely caulked from the water line to her rail. The tarpaulin covers which the Bowling Green carried for cargo protection were about two and one-half years old, and at the time of the accident in good condition, the average life of such covers being about eight years.

After leaving the repair yard, and on or about December 18, 1932, the Bowling Green, loaded safely, carried and delivered at their destination a shipment of cocoa beans in bags, and immediately thereafter went to Pier 2 Bush Docks to load the shipment involved in this suit.

The Bowling Green while at Bush Docks loading and subsequent to loading was thoroughly inspected and found in good condition, with no leakage, breakage, or indication of unseaworthiness. The Bowling Green was pumped out during the afternoon of December 30, 1932, and again shortly prior to her arrival at Pier 64, North River, and was inspected by her master and mate before they went to bed, who found it was unnecessary to pump her before they turned in for the night.

The Bowling Green was not in contact or collision with other vessels or docks while in tow of the steamlighter Getchell, from Bush Docks to the slip between Piers 64 and 65, and was landed without incident outside of the lighter Munson No. 68, which was lying at the bulkhead.

When the captain and mate of the Bowling Green arose on the morning of December 31st, they found on inspection that she was not leaking.

Subsequent to careening, the Bowling Green was inspected after she had been pumped out and found to be tight, not leaking, and in good condition.

Subsequent to the accident, and on January 4, 1933, without the requirement of any repairs whatever, the Bowling Green again loaded gunnies and continued to carry cargoes in and about the harbor of New York.

The marine surveyor called on behalf of the respondent-impleaded, Standard-Vacuum Transportation Company, who inspected the Bowling Green five days after the accident, did not testify to any condition of unseaworthiness or leakage or decay about the Bowling Green.

The Bowling Green at the time of the accident in suit was in all respects tight, staunch, strong, and seaworthy.

The captain of the Bowling Green was an experienced man, who had been engaged in carrying cargoes of a similar nature in and about the harbor of New York since 1904, and was qualified to load and stow gunnies in bales, and knew the proper, usual, and customary method employed in that operation, and the mate was fully qualified in these respects.

The bales were of two sizes, stowed four tiers high, with a partial fifth tier, with a space between the inside of the rail of the lighter and the bales of about 6 or 8 inches. The rail was about eight inches wide and there was a wearing piece on the outside of the lighter about four inches wide, thus the bales were stowed inboard of the outside of the wearing piece of about $1\frac{1}{2}$ feet, and could not interfere with other objects or vessels which might come in close proximity to the Bowling Green. The height of the cargo was about 9 or 10 feet. The lighter was loaded so that it would have a slight list to starboard and forward to permit of the pumping of the ordinary leakage from the starboard forward end.

There was no proof of faulty stowage of the cargo or of excessive height.

While it is true that the mate of the Munson No. 68 testified that after the Bowling Green had lost gunnies from both her starboard and port sides amidships, he noted spaces between the bales which remained on board; it is also true that he admitted that the listing and dumping of a portion of the cargo, and the consequent shifting of the remainder on deck, would account for the spaces which he found between the bales.

The Bowling Green was in all respects properly stowed.

The capacity of the Bowling Green was 450 tons, and on the occasion in question she was laden with only 348 tons. She subsequently carried cargoes in excess of that figure, and on one occasion, some two months after the accident, the lighter was laden to her full capacity of 450 tons with bagged fertilizer without having required any repairs.

The Bowling Green was well within her capacity in the carriage of the cargo involved in this suit.

The evidence to which I have hereinbefore referred on the question of seaworthiness clearly shows that the Bowling Green was properly pumped out, and the fact that the steam lighter Getchell, aft-

er the Bowling Green had careened, pumped on the Bowling Green for a period of about thirty minutes, does not in any way controvert that fact, as it is clearly shown that the water pumped out by the Getchell had not entered through the seams in the vessel, but was taken in through the forward port hatch when the lighter, after losing bales on the starboard side, took a sharp list to port resulting in the water washing over the rail and into the hatch. This is corroborated by the fact that the Bowling Green did not leak after she was pumped out.

Any presumption of unseaworthiness or negligence which may have arisen by the careening of the Bowling Green has been rebutted by the affirmative evidence of the seaworthiness, proper stowage of cargo capacity, and pumping of the Bowling Green, and the duty of going forward and proving negligence rests upon the parties which would have the Flower Lighterage Company, Inc., Manhattan Lighterage Corporation, and lighter Bowling Green held liable.

The Bowling Green was on December 30, 1932, at about 10:10 o'clock p. m., landed with her bow down stream outside of and moored port side to the Munson No. 68 which was at the bulkhead between Piers 64 and 65, North River.

The freeboard amidships was about two feet or more and was loaded with a slight list to her pump at the starboard bow corner.

The lighter Socony No. 175 was on December 31, 1932, at about 12:30 o'clock a. m., brought into the slip by the steamtug Socony No. 16, and landed outside of the Bowling Green, with her port side to the starboard side of the Bowling Green, and with her bow also facing down stream.

The Socony No. 175 was 85 feet long, 31 feet wide, 10 feet deep, and had a raked bow and stern, and was loaded with a light cargo of 200 bags of wax stowed amidships. She had a freeboard of 6 or 8 feet amidships, and, according to her captain's testimony, at her port stern, and her rail was about 3 feet higher than the rail at the stern of the Bowling Green. The Socony No. 175 had a sheer to both ends, as did also the Bowling Green, so that the rail of the Socony No. 175 would be higher than 3 feet above the deck of the Bowling Green at the starboard side amidships.

The cutaway at the stern of the Socony No. 175 did not commence at her rail, but she was straight-ended for a distance of about 2 feet down from her deck, at which point her rake commenced and ran down to the water's edge.

The top corner iron of the port stern corner of the Socony No. 175 was missing, and the second corner iron which was located at the point where the cutaway commenced was loose in its fastenings.

There was offered on behalf of the Bowling Green evidence that there was a spike or bolt projecting out a distance of about one inch from the second corner iron at the point of the port stern corner of the Socony No. 175. There is no specific contradiction of that evidence, but Sutherland, the marine surveyor for the Standard-Vacuum Transportation Company said that some few days later he did not find the projection. I do not find that the captain of the Socony No. 175 was interrogated with respect to it. The positive evidence is entitled to greater weight than the negative evidence, and I must therefore accept as true the existence of said spike or bolt.

The captain and mate of the Bowling Green were in their bunks at the time when the Bowling Green was landed, and neither heard nor saw the landing.

The Socony No. 16 was 96 feet long and 23 feet wide, and was towing the Socony No. 175 on her port side with the lighter's bow ahead, and with the stern of the tug extending a distance of about 8 feet beyond the stern of the Socony No. 175.

The steamer Cristobal, 489.5 feet long and 58 feet beam, was moored on the south side of Pier 65, bow toward the bulkhead, but the exact distance that her stem was from the bulkhead was not fixed.

The slip was 205.05 feet wide, and Pier 65 was 555.86 feet long.

The clear space between the starboard side of the ship and the north side of Pier 64 was 147 feet.

The Munson No. 98 and the Bowling Green were each about 30 feet wide, which would make them extend out about 60 feet from the bulkhead. The advocate for the Standard-Vacuum Transportation Company Socony No. 175 contends that the figures as to the size of the steamship Cristobal, width of slip and length

of pier, are wholly speculative. This does not seem to me to be so. The length of Pier 65 is but 65.36 feet greater than the length of the steamship Cristobal, and as the evidence shows that the Munson No. 68 and the Bowling Green were moored at the bulkhead about midway between the piers, the bow of the steamship Cristobal would, even if her stern was out even with the end of the pier, have been but about 20 feet from the stern of the Bowling Green. I do not mean to say that the Socony No. 175 could not have been landed without her port stern corner coming forward of the starboard stern corner of the Bowling Green during the landing, but such a landing would have been accompanied with considerable difficulty.

This evidently was appreciated when you consider the testimony of the mate of the Socony No. 16, that while passing up the slip, she proceeded with her tow close along the side of the Cristobal, so that the port side of the Socony No. 175 was but 2 feet from the side of the ship, until the tug and tow had reached a point about 100 feet from the Bowling Green.

The master and other witnesses from the Socony No. 16 all testified that upon entering the mouth of the slip, the tug's engines were stopped and she drifted up the slip with a slight kick ahead to straighten her up, until she was a distance of 100 feet from the Bowling Green, when she started to turn to starboard so as to bring the port side of the Socony No. 175 against the starboard side of the Bowling Green; that the Socony No. 16 and her tow continued to drift, practically the entire length of the slip, and in the turning operation to starboard, and while still in going ahead motion, her engines were reversed for a short period to stop her and drop her port stern corner in first toward the Bowling Green; that a line was put out from her port quarter to the starboard stern corner of the Bowling Green; that the tug then kicked ahead to put her bow end in, and a line was run from her middle bow to the starboard bow corner of the Bowling Green.

Of course it could not be held to be negligence to properly make fast the Socony No. 175 alongside the Bowling Green, but the method of making fast the lines was one that would leave considerable slack which would be increased by a considerable disturbance of the water, thus permitting the Socony No. 175 to pound against the Bowling Green, and as the master knew there was no one aboard the Socony No. 175 to tend her lines, I do not believe she was properly moored, and this constituted negligence.

It is claimed by her proctors, that at no time did the port stern corner of the Socony No. 175 get beyond the starboard stern corner of the Bowling Green, but I think that claim is erroneous, in view of the fact that the tug and barge were continually drifting and rounding to starboard, and the tug's engines were not in reverse until she was in a position with her own port stern corner nearer to the Bowling Green than her port bow corner.

It seems to me that the master of the Socony No. 16 was testifying more from his usual practice than from this particular landing.

The mate and deckhand of the Socony No. 16 differ widely as to the reasons for keeping back the port stern corner of the Socony No. 175.

It seems to me that the testimony of witnesses, that there was no contact between the Socony No. 175 and the Bowling Green or her cargo, at most, cannot be given greater force than that they felt and heard no contact.

It is not contended in this case that there was any contact of the hulls, nor any forceful contact between the port stern corner of the Socony No. 175 and the cargo of the Bowling Green, but simply that there was actual contact and rubbing between the port stern corner of the Socony No. 175 and the covers and cargo of the Bowling Green, resulting in the displacement and disturbance of the cargo and contributing to the loss in suit.

Clearly, the master of the Socony No. 16 in his pilot house could not see whether the point of the port stern corner two feet down from the rail was against the cargo of the Bowling Green.

The mate of the Socony No. 16 was at the bow of the Socony No. 175, attending to the job of putting out his line.

There would have been no shock or tremble as the cargo on the Bowling Green would give with the contact.

The captain and mate of the Bowling Green arose about 6:30 a. m. on the morning of December 31, 1932, and found

the cargo cover on the starboard side, a distance of 8 to 10 feet aft of amidships, and at a point about 3 feet above the deck, was holed and chafed horizontally as if from the contact of some object rubbing along it; also that the second tier bales had been pulled outboard, and that the stowage of bales was disturbed above it and that six or eight of the cover straps immediately below the place where the cover was torn, and over a distance of about 15 feet, were broken from the cover.

They immediately went to the engine room with the intention to start the engine, lift the covers, and straighten out the cargo. At that time a high wind was blowing into the slip, the water was choppy, and the Socony No. 175 was jumping and rebounding against the Bowling Green. While they were in the engine house they heard the bales drop overboard from the starboard side one after another, being 32 bales in all.

The lighter then took a sharp list to port and a number of bales were lost from that side after the lighter had been listed to port for a short period of time; the straps on the port side being broken from this dumping.

While I believe the size of the hole, as testified to by the captain and mate of the Bowling Green, was larger than the actual size of the holes, they were corroborated as to the existence of the holes by other witnesses, including the marine surveyor for the Standard-Vacuum Transportation Company.

The time of the dumping was 6:45 o'clock a. m.

It is true that nearly six hours elapsed between the time the Socony No. 175 was landed at 12:30 o'clock a. m., and the time of the dumping at 6:45 o'clock a. m., but it was also true that the wind velocity at 12:30 o'clock a. m. was about 17 miles per hour, and had steadily risen to 34 miles per hour between 6 o'clock a. m. and 7 o'clock a. m., reaching a maximum velocity of 41 miles per hour at 6:50 o'clock a. m.

The wind was from the south until about 2 o'clock a. m., and then went to southwest, continuing from that direction, entering the slip and passing through it until the time of dumping.

The tide was running ebb for some time before the dumping and there was choppy water and swells at the mouth of the slip, and the disturbed condition of the water obtained well up to the bulkhead.

The Socony No. 175, after she was landed, was left wholly unattended, and in mooring her, the lines at both bow and stern were singled and slacked to such an extent that in the morning the port stern end of the Socony No. 175 was at times some distance away from the side of the Bowling Green, and the heavy wind and swells caused some pounding against the Bowling Green, and considerable jumping. The result of this pounding and jumping was to complete the displacement and dumping of the cargo which had been started by the contact of the Socony No. 175 when landed alongside with the cargo of the Bowling Green.

Even though the lines were slack when the Socony No. 175 was landed and contacted with the cargo, the Bowling Green did not feel any effects from that until the wind and sea arose.

The captain and mate of the Bowling Green, Petersen, the runner for her owner, and Wells, the marine surveyor, all testified that they saw pieces of gunnies' clinging to the spike, on the Socony No. 175, and that the spike or bolt was located a distance of about 6 feet from the water, and that it coincided with the height of the cover which was torn on the Bowling Green's starboard side amidships, also at a distance of about 6 feet from the water.

The captain of the Socony No. 175 was not interrogated in this respect.

The only attempt to meet this was the testimony of Sutherland, the marine surveyor for the Standard-Vacuum Transportation Company, that he inspected the Socony No. 175, on January 5, 1933, and did not see any projection of any sort on the port side, nor did he notice any burlap or anything like that at the corner, but did find some hairs, such as pull off ropes found on any of their barges, especially on the rails and guards. The positive evidence as to conditions shortly after the accident is entitled to greater weight than this negative evidence of conditions found five days after the accident, and I accept as true the evidence of conditions found shortly after the accident.

The testimony of the Munson Line harbor master was unconvincing, and does

not overcome the positive proof in this case, and certainly he showed very little interest in the Bowling Green, for one who experienced anxiety as to the possibility of her dumping her cargo.

Whether the relations between the Munson Line and the Standard-Vacuum Transportation Company were such as to make the captain of the Munson No. 68 to any extent an interested witness is of no moment, as his testimony is too indefinite to warrant me in accepting his general statement as to her having a big load, and the extent of the list as against the positive evidence hereinbefore referred to. He admits that he did not look down the starboard side, and could not testify as to the condition of the stowage on the starboard side or the cover.

The testimony of the mate of the No. 68 requires but slight consideration. His testimony that the Bowling Green was listed to starboard when he saw her at 6:30 o'clock a. m. may well have resulted from the fact that the lighter had a deck load which was somewhat disturbed and this may have made the list seem larger to him. The attempt to 'show by this witness that the cover straps on both sides of the Bowling Green were not fastened loses its force in view of his testimony that he observed this condition just as they were about to lift the covers after she had dumped from both sides.

I accept as controlling the positive evidence of the captain and mate of the Bowling Green, that on the previous afternoon they had fastened the covers on both sides.

The testimony of the captain of the Socony No. 175 contradicts the testimony of the captain and mate of the Munson No. 68 as to the condition when he arrived at 7:30 o'clock a. m. and went on his boat, over the stern of the Bowling Green.

The conflict in the evidence as to the length of time during which the Bowling Green was listed to starboard before the bales were lost overboard, does not impress me as showing there was water in the Bowling Green, but does convince me that the gunnies were disturbed and started overboard, which gave the Bowling Green a greater list than she had the night before.

■ The Standard-Vacuum Transportation Company and the lighter Socony No. 175

having been impleaded on the petition of the Manhattan Lighterage Corporation, that corporation was bound to prove, by a fair preponderance of the evidence, that the accident resulted from the negligence of the said respondents impleaded, or either of them.

■ The evidence and the surrounding circumstances that were shown on the trial of this action convince me that the Standard-Vacuum Transportation Company and the lighter Socony No. 175 were solely and wholly at fault.

■ The right of the libelants William R. Pinner and Manuel Luzunaris, copartners doing business under the firm name and style of Pinner Luzunaris Company, to recover was challenged by the proctors for the respondents Ellerman & Bucknall Steamship Company, Limited, and Norton, Lilly & Co., who contended that such libelants were not the owners of the bill of lading, nor the agents of the owner of the bill of lading on which they seek to recover, at the time of the delivery of the shipment at the port of destination, and that by the denial of their application for leave to amend, by Judge Byers of this court, they are prevented from recovering in this suit.

Whether they could or could not recover against the respondent Ellerman & Bucknall Steamship Company, Limited, and Norton, Lilly & Co., for failure to deliver the cargo in good order and condition at the port of destination, in accordance with the terms of the bill of lading, seems to require no further consideration in this suit, under the facts as I have found them.

Those libelants were the holders of the bill of lading in question when the damage to the cargo took place, caused as I have found solely and wholly by the negligence of the respondents impleaded, Standard-Vacuum Transportation Company and the lighter Socony No. 175, and those libelants presumptively bore the loss when they transferred the bill of lading; therefore, they are entitled to recover.

There is no conflict between them and the owner of the bill of lading, to whom delivery at the point of destination was made.

■ The Standard-Vacuum Transportation Company prayed for limitation of liability. It is somewhat doubtful if proof was offered to sustain that defense, but in any

event limitation of liability cannot be had by the surrender of the Socony No. 175 alone, but there must also be surrendered the Socony No. 16.

A decree may be entered in favor of the libelants against the respondents impleaded, Standard-Vacuum Transportation Company and lighter Socony No. 175, with costs and the usual order of reference, and dismissing the libel as to Ellerman & Bucknall Steamship Company, Limited, Norton, Lilly & Co., Manhattan Lighterage Corporation, and lighter Bowling Green, in each instance, without costs, and dismissing the libel and petition as to the Flower Lighterage Company, Inc., without costs.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty, 28 USCA following section 723, proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.