**VIRGIN ISLANDS CORPORATION, Libellant**

v.

**MERWIN LIGHTERAGE CO., INC, in personam, Respondent**

Civil No. 20 -- 1954

District Court of the Virgin Islands,

Div. of St. Croix at Frederiksted

February 28, 1957

*See, also, 149 F. Supp. 269*

*Same case on appeal, see p. 629, this volume*

WARREN YOUNG, ESQ., Charlotte Amalie, Virgin Islands and BINGHAM, ENGLAR, JONES AND HOUSTON, New York City, (WARREN H. YOUNG, ESQ., of Charlotte Amalie, Virgin Islands (of counsel), *for libellant*

JOHN D. MERWIN, ESQ., Frederiksted, Virgin Islands, *for respondent*

MOORE, *Judge*

This is an action in admiralty, for cargo loss and damage brought by the libellant, Virgin Islands Corporation, against the Merwin Lighterage Company, Incorporated. Libellant is represented by its proctors, Warren Young, Esquire, and Bingham, Englar, Jones and Houston, Warren H. Young, Esquire, of counsel. Respondent is represented by its proctor, John D. Merwin, Esquire.

The complaint herein was filed on September 30, 1954. This matter came on for hearing June 15 and September 21, 1955. Thereafter, transcript of all testimony was made, and, thereafter, both sides submitted briefs and oral arguments.

A brief statement of the facts is as follows: On August 26, 1952, the "SS Alcoa Puritan" arrived at the Port of Frederiksted, with a shipment consigned to the libellant herein, consisting of one package generator in twenty-eight boxes. The port of Frederiksted is an open port, and has

neither harbor nor dock, but what is known as a wharf. Consequently, steamships must anchor off shore, and cargo must be discharged into lighters to be taken ashore to the wharf. The respondent is a lighterage company, which on the aforesaid date, August 26, 1952, had an agreement with Alcoa Steamship Company to lighter all such cargo to this wharf.

Lighterage operations were started from the "SS Alcoa Puritan" early that morning in normal weather. However, a squall and/or ground sea began to build up during the morning, and reached a point of intensity about noon, or afternoon, where these barges could not discharge their cargo ashore, but had to be taken to their moorings for the night. Two such barges were taken there, one survived the storm for the night, and the barge in question ("B-2") lost its cargo into the sea. It is for the loss of this cargo that libellant brings suit and alleges negligence on the part of the respondent, and claims the following:

1. That the barge in question ("B-2") was unseaworthy.

2. That respondent was negligent in accepting the cargo from the "SS Alcoa Puritan" under the prevailing weather conditions.

3. That respondent was negligent in not lashing down the cargo on the barge "B-2" before mooring it for the night, as was done on another barge which did not lose its cargo.

Respondent argues in response to these claims that it was not negligent in that: (1) The barge "B-2" was in seaworthy condition. (2) That the storm was a "freak" storm, which came up suddenly, and that it had no notice of the storm when it accepted the cargo, but the storm so suddenly increased in intensity that it had to move the barge from the ship "SS Alcoa Puritan" to keep it from breaking up against the ship; and (3) That the cargo could not be lashed down due to the roughness of the sea, and

that therefore the cargo was lost by "act of God", and no negligence of the respondent contributed thereto.

This court has heard extensive argument on the amount of liability, if any, but before we go into that question we must first consider whether the respondent is liable for the loss by its negligence. There is no dispute that the cargo upon the barge "B-2" was lost during the night as a result of the storm, while it attempted to ride the storm at its moorings. There is also no dispute of the value of the total loss, which was $27,821.48. The dispute hinges over whether respondent was negligent, either before or in the face of the storm. That question must be decided first before going into the extent of the total sum for which defendant is liable, if negligence is found. It must be noted that suit herein was filed more than two years after the loss, and this testimony taken about two and one-half years after the loss, and that there is, therefore, much conflict of testimony as to details and especially as to times of day of the various operations and sequence of happenings of the various operations, as well as the condition of the weather at the various times of the day.

The evidence seems to establish the following: That the rough sea began to build up about 10 a.m.; that landing operations of the barges were completed about 3:30 or 3:45 p.m.; that, either at that time or some time before, it was discovered that the sea was breaking in and was too rough for the barges to go ashore, and that they would have to be taken to the moorings to await abatement of the rough sea. Both barges were taken to the moorings. The storm, however, increased in intensity during the night, and some time between 12 midnight and 2 a.m. the packages on barge "B-2" were washed into the sea. The packages on the plywood barge were not washed into the sea. That the packages on barge "B-2" were not lashed down, and that the packages or cargo on the plywood barge were lashed down. The

questions unanswered by the evidence are: (1) Whether the barge "B-2" was fully or partially loaded when it was discovered that the barges could not reach the dock. (2) Whether barge "B-2" and the plywood barge were loaded at the same time, or which was loaded first. (3) Whether either had discharged any previous loads at the dock. (4) Whether the lashing down would have saved the cargo on barge "B-2," and, finally, whether, in the sudden rough weather, this cargo could have been lashed down. The only conclusion from the evidence is that it could not, as it was too hazardous.

On this latter point Henry Walcott, a witness for the libellant, testified as follows: That the sea was not rough when barge "B-2" was brought alongside the "SS Alcoa Puritan," and he cannot remember what time the barge was brought alongside ship, and that he cannot remember how long it took to load the barge. The barge was not loaded to capacity. That he tried to lash the cargo down after the sea got rough, but was unsuccessful. That he was the pump man, but the barge "B-2" was not leaking. There were four other men on the barge. And, in answer to questions from libellant's proctor concerning them, he answered as follows: "Q: Were the other four men trying to lash her down? A: They were doing it. Q: Did you not have four other men who could help you? A: They had already leave the ship. The four men stay on the next lighter." (This is presumably the plywood lighter where the cargo was successfully lashed down), and finally verified a statement made to the libellant's proctor that, "If it ('B-2') had been kept alongside the ship long enough to lash the cargo down, the barge might have been smashed up, so they stopped trying to lash the cargo down and went right from the ship's side to the mooring." The evidence does not show further whether the sea was too rough to lash it down, either at the mooring or en route thereto, but the evidence of this

247

and other witnesses tend to show that it was a dangerous operation. This witness stayed on barge "B-2" until the middle of the night when it discharged its cargo into the sea and then he swam ashore.

While some portions of the evidence conflict, it is clear that the weather was calm in the morning and attained gale force at night; that the weather was freakish and unpredictable and that the storm was the direct cause of the loss of the cargo. From the state of the testimony, it is not clear, beyond a fair preponderance of the evidence, that there was negligence on the part of the defendant or its agents which directly contributed to the loss of the cargo, when all things are considered, to wit: The Frederiksted seaport is an open roadstead and the stormy weather occurred during what is known in the islands as "the hurricane season"; that the storm that day was rather sudden, freakish and unpredictable. There is no evidence that the barge "B-2" was unseaworthy. The foreman and longshoreman engaged in the lightering of the cargo were veterans in this work, some with over fifteen years of experience. From the evidence it appears that both the plywood lighter and the "B-2" went out to lighter the cargo; that it was only after the plywood lighter discovered that it could not return to the dock that it was decided to take the "B-2" to the mooring on account of the bad weather; that the rough seas and squally weather prevented the lashing down of the cargo on the "B-2" and, even if it were lashed down, there is no certainty that the "B-2" would not have foundered and the cargo sunk. While it is true that it would have been better not to have taken on the cargo, it must be remembered that at the time the lighters went out to the "SS Alcoa Puritan" the weather presented no threat to the lighters or cargo; that this hazard subsequently developed, and the "SS Alcoa Puritan" itself was obliged to fight the stormy weather and heavy swells. The evidence

shows that the "B-2" could not remain close to the "SS Alcoa Puritan," and, as it could not go to the dock, there was nothing else to do but tow it to the mooring. There is no evidence that any public or official notice was given of an impending storm, as is usually the case when a storm is anticipated. The evidence and records of the officer from the Coast Guard Station at Frederiksted does not reveal any such storm brewing.

Describing the treacherous and unpredictable kind of weather that day and often times experienced at the Frederiksted roadstead, I quote from the testimony (pages 71 and 72) of the witness Anthon Roberts, one of the foremen in charge of the lighters, with fifteen years of experience lightering at Frederiksted:

"Q. Would you say that this storm that occurred was a normal rough sea, or was it anything unusual from your experience working on the water front? A. I think it was a freak, because the morning was pleasant; that just come in suddenly.

"Q. Were there any warning that it was going to come up or turn into a squall? A. No, because I spoke that with Lucas. I told him, I say, we were there all the time and suddenly this gush of wind came and then the heavy sea followed it immediately.

"Q. What would you call it, a storm, or something local? A. I figured it was a storm, so I told Lucas may be there must have been some storm passing around and nobody had reported it.

"Q. How was it acting, this sudden squall; was it a steady affair? A. We had gushes of wind and rain. It was blowing in a gushing form.

"Q. What would be your estimate of the height of the sea that night? A. When we were there?

"Q. Yes? A. I figure it from the waves — I think we had seas about twelve feet.

"Q. Were there occasions when you worked on the dock before. Have you had much experience there? A. I work there now, I should think nearly fifteen years, because I am thirty-nine. I used to be around there from the time I was about twenty.

"Q. You recall this as an unusual sea? A. Yes, sir. That is

the first of my working that I have seen one like that. It had one once, I don't know if you could call it an experience in Court, but I know one night I went to sleep and leave it very calm. The morning I get up I found at the Custom House the big boat all mash up and the sea was calm. That happened while I was asleep."

This court agrees fully with the argument of proctor for the libellant herein that the respondent cannot claim an act of God if its negligence in the circumstances also contributed to the loss, but in the state of the testimony herein this court is of the opinion that from the evidence it cannot be said that the testimony proves negligence by a fair preponderance, without the unwarranted assumption that despite Henry Walcott's testimony the sea was not too rough to lash down the cargo on barge "B-2." There is no evidence to show that the sea was not too rough, or the operation not too hazardous.

Finding, must, therefore, be for the respondent, and order may be thus drawn.