**VIRGIN ISLANDS CORPORATION**, Appellant

v.

**THE MERWIN LIGHTERAGE COMPANY**, Appellee

No. 12305

United States Court of Appeals

Third Circuit

Argued December 20, 1957

Decided February 7, 1958*

*See, also, 251 F.2d 872*

*Certiorari denied 357 U.S. 929, 78 S. Ct. 1369, 2 L. Ed. 2d 1372.

WARREN H. YOUNG, Christiansted, St. Croix, Virgin Islands, *for appellant*

JOHN D. MERWIN, Frederiksted, St. Croix, Virgin Islands, *for appellee*

Before, GOODRICH, KALODNER and HASTIE, *Circuit Judges*

HASTIE, *Circuit Judge*

■ ■ We have here a dispute concerning legal responsibility for damage to cargo in the course of lighterage from ship to shore at the Port of Frederiksted in the Virgin Islands of the United States. This appeal has

been taken by the libellant Virgin Islands Corporation, which was the owner and consignee of the cargo. It sued The Merwin Lighterage Company, a private carrier which had custody of the cargo at the time it was damaged. The cargo was machinery, a disassembled generator, packed in some 28 crates and boxes.

At the Port of Frederiksted there is no harbor or protected anchorage. For a Frederiksted call, an ocean going vessel anchors in an open roadstead a quarter mile or more from shore. There cargo is transferred to lighters which carry it to be landed at a small wharf which extends out a short distance from the margin of the strand. The open roadstead and the wharf itself are entirely exposed to the action of wind and wave.

On the August day in question a ship was anchored in the Frederiksted roadstead completing the discharge of cargo for that port. Respondent's lighters were accomplishing the ship to shore transfer. Late in the morning a shifting wind, attended by rain squalls and increasing seas, hampered the unloading and landing to the extent that operations were suspended. Somewhat later this work was resumed and by midafternoon the last of the Frederiksted cargo had been transferred from the ship to two lighters designated as the "plywood barge" and the "B-2". There is uncontradicted evidence that the "B-2" was the last loaded.

By the time the loading of the last of the cargo upon these two lighters had been completed, the action of waves beating and breaking in toward the shore had again made the use of the wharf difficult. In the circumstances, it was decided to take the two loaded barges to their moorings, a short distance off shore, and to leave them there overnight with a view to landing the cargo in more favorable weather the next day. However, during the night

the weather became worse. No harm came to the "plywood barge" or its cargo. But libellant's crates of machinery were cast from the deck of the "B-2" into the sea. Although this cargo was later salvaged it had suffered great damage for which this suit has been brought.

The libellant asserts that the loss in suit was caused by the negligence of the respondent bailee. The defense is that the loss of the cargo overboard was an "inevitable accident" caused by "an extreme and sudden storm and unprecedented high seas which could not reasonably have been anticipated". After full hearing the District Court found that the loss had resulted from "inevitable accident" and entered a decree exonerating the respondent.

We are unable to sustain this judgment. In our view the undisputed facts, evaluated in the light of correct legal principles, compel a finding that the respondent did not exercise due care for the protection of libellant's property.

We accept the district court's finding that the storm which developed during the night was more severe than could reasonably have been foreseen. But the fact that unusually severe weather has been a factor in causing cargo damage is not enough to establish the defense of "inevitable accident" resulting from a "peril of the sea". It must also be shown that weather conditions were more than a staunch and adequately equipped vessel, with its cargo property secured, could have withstood. Eastern Gas & Fuel Associates v. Martin Marine Transp. Co., 3 Cir., 1951, 190 F.2d 394, 396-397; The Plow City, 3 Cir., 1941, 122 F.2d 816, 818, certiorari denied Plow City S. S: Co. v. Texas Gulf Sulphur Co., 315 U.S. 798, 62 S. Ct. 579, 86 L. Ed. 1199; Norris Grain Co. v. Great Lakes Transit Corp., 7 Cir., 1934, 70 F.2d 32, certiorari denied 293 U.S. 565, 55 S. Ct. 75, 79 L. Ed. 664.

The facts already stated and additional undisputed

facts make it clear that failure of the respondent to secure the cargo on the "B-2" was a substantial factor in this mishap. Topside, the "B-2" had a flat deck with no railing or other structure to restrict the lateral movement of objects placed upon the deck. There were, however, ring bolts, cleats, fasteners and rope, constituting appurtenances and gear suitable for lashing down deck cargo. However, the District Court explicitly found that on this occasion the crates of machinery were placed and left on this deck without being lashed down. In contrast, the cargo on the "plywood barge", which had been loaded just ahead of the "B-2", was lashed down with ropes. Left at their moorings near the Frederiksted shore overnight these two loaded barges had contrasting experiences. The lashed cargo rode out the storm on the deck of the "plywood barge". The unsecured cargo was cast overboard from the "B-2". This unusual situation of the contrasting experiences of two lighters moored in the same roadstead during a storm compels the conclusion that this mishap was not an inevitable accident. This court has had occasion more than once to reverse a finding of inevitable accident when the record has showed that the weather, though bad, was less than catastrophic and that some reasonable precaution could have been taken to protect vessel or cargo against its impact. Swenson v. The Argonaut, 3 Cir., 1953, 204 F.2d 636; Eastern Gas & Fuel Associates v. Martin Marine Transp. Co., supra; The Plow City, supra. This is plainly such a case.

■ There is another legal rule, applicable to the loss of goods at sea by a private carrier, which is significant for the evaluation of the evidence in this case, although the trial court did not allude to it. Although a libellant who claims damages for the loss of his property during bailment has the burden of proof as to negligence, the very fact that a private carrier has lost the goods en-

trusted to it creates such an inference of fault that the carrier must come forward with some exculpatory showing. Schnell v. The Vallescura, 1934, 293 U.S. 296, 305, 55 S. Ct. 194, 79 L. Ed. 373; The S. C. L. No. 9, 3 Cir., 1940, 114 F.2d 964, 968; Aetna Ins. Co. v. Florida Towing Corp., D.C.S.D. Fla. 1941, 37 F. Supp. 781.

Here, far from being exculpatory, the evidence reinforces the presumption of fault on the part of the bailee. The District Court in its opinion observed "there is no evidence to show that the sea was not too rough [for lashing down the cargo of the 'B-2'], or the operation not too hazardous". This statement ignores the above stated burden of going forward with evidence. But beyond that, there was affirmative indication that it would have been feasible to secure this deck cargo. First, the cargo of the "plywood barge", loaded only a short time before the "B-2" was lashed down. Second, weather observations taken from the log of the ship from which the cargo in question was unloaded were in evidence. They showed Force 3 winds at midday, diminishing to Force 2 at 4 P.M., by which time the loaded barges had been towed away from the ship. Thus, except for possible gusts or squalls of short duration, the winds are shown to have been gentle or slight during periods when the securing of the cargo could have been undertaken. Moreover, to sustain the picture of a severe and unexpected storm late that night witnesses for respondent contrasted the very severe late evening weather with the moderately rough but not unusual seas created by shifting wind and occasional squalls in the afternoon and early evening.

With particular reference to lashing, there was testimony that employees of the respondent started to lash down the cargo while the "B-2" was being loaded alongside the ship. However, wave action was pounding the lighter against the ship's hull and it was deemed expedi-

ent to load as quickly as possible so that the lighter could be towed away from the ship. This was done. But in this record the failure again to undertake the securing of the cargo after the lighter was clear of the ship remains wholly unexplained, except for testimony that all of the respondent's employees except one left the lighter very soon after it was loaded. And this remaining lighterman testified that the lashing operation would have been too much for him alone. All of this gives a picture of neglect of an obvious and indicated precaution, not of natural forces making that precaution impracticable.

On the entire record we cannot avoid conclusion that respondent's fault, as well as the stormy weather, played a substantial part in this unfortunate mishap. The District Court should have so found and, therefore, should have held the respondent legally liable for the cargo loss.

Both sides recognize that there is an issue concerning limitation of liability which the District Court did not reach in its disposition of the libel. However, our disposition of the question of liability will make it necessary that the District Court consider and decide whether there has been an effective limitation of liability.

The judgment will be reversed and the cause remanded for further proceedings consistent with this opinion.