**VIRGIN ISLANDS CORPORATION,**
Libellant
v.
**MERWIN LIGHTERAGE CO., INC.,**
Respondent

Civil No. 20-1954
District Court of the Virgin Islands
Div. of St. Croix at Frederiksted
October 22, 1959
*See, also, 177 F. Supp. 810*

WARREN H. YOUNG, ESQ., Christiansted, Virgin Islands (BIGHAM, ENGLAR, JONES & HOUSTON, New York, N. Y., on the brief), *for libellant*
WILLIAM H. D. COX, ESQ., Charlotte Amalie, Virgin Islands (COX AND BORNN), *for respondent*

MARIS, *Circuit Judge*

On August 26, 1952, the S.S. Alcoa Puritan arrived at the port of Frederiksted with cargo shipped by the Department of the Interior, Virgin Islands Corportion, to the consignee, the Virgin Islands Corporation, Christiansted, St. Croix, consisting of one disassembled generator packed in 5 skids, 34 boxes and 12 crates. The port of discharge of the goods from the ship was Frederiksted. Because this port does not have a deep water pier or wharf, ocean-going vessels anchor in an open roadstead approximately a quarter of a mile from shore and goods destined for the port are transferred by lighters to shore. The Merwin Lighterage Co., Inc., has for many years furnished Lighterage service at the port of Frederiksted. In this instance, the cargo consigned to the Virgin Islands Corporation was loaded by Merwin Lighterage Co., Inc., aboard two of its barges. During the process a squall arose which prevented discharge of the goods on shore and the barges, with the cargo aboard, were secured to moorings in the roadstead for the night. On one barge the cargo had been lashed down; on the other, Barge B-2, the cargo had not been so secured and it was washed into the sea during the night.

On September 30, 1954, the libellant, the Virgin Islands Corporation, brought this suit in admiralty against the respondent, Merwin Lighterage Co., Inc., for cargo loss and damages. After trial, this court found, inter alia, that the respondent was not negligent in failing to lash down the cargo on the B-2 and judgment was entered in its favor. 1957, 3 V.I. 243, 149 F. Supp. 269. On appeal, the judgment was reversed on the ground that the evidence com-

pelled the finding that the respondent had not exercised due care for the property, the evidence creating an inference of fault which had not been overcome by the respondent's evidence. The cause was remanded to this Court for determination of the question whether the respondent is entitled to limitation of its liability and for the entry of a final judgment. 1958, 3 V.I. 629, 251 F.2d 872, cert. den. 357 U.S. 929, 78 S. Ct. 1369, 2 L. Ed. 2d 1372.

It is agreed that the damages, including salvage expenses, amount to $27,821.48, but the respondent says that its liability is limited to a maximum of $500 per package. If so, it is agreed that its liability would be only $10,800.00. In order to have its liability thus limited, the respondent must come within the provisions of the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300-1315, or show a contractual limitation of liability in its favor. Herd & Co. v. Krawill Machinery Corp., 1959, 359 U.S. 297, 79 S. Ct. 766, 3 L. Ed. 2d 820. The respondent does not claim the benefits of the Act but contends that the terms of the contract of carriage contained in the bill of lading entered into by the shipper with Alcoa Steamship Company, Inc., which limits Alcoa's liability for negligence, are available to it as a third-party beneficiary.

■ ■ It is well settled that contracting parties may, if they intend to do so, validly extend a contractual benefit to a third party. Restatement, Contracts, § 133. Such intention must be clearly expressed, however. The Supreme Court in Herd & Co. v. Krawill Machinery Corp., 1959, 359 U.S. 297, 305, 79 S. Ct. 766, 3 L. Ed. 2d 820, cautioned that "contracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they 'are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the under-

83

standing of the contracting parties.' Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 123-124, 75 S. Ct. 649, 99 L. Ed. 933 (concurring opinion)." Accordingly, I turn to the bill of lading itself in order to ascertain whether the parties to it expressed an intent to extend the benefit of the limitation of liability provisions to one in the position of the respondent.

A short form bill of lading was issued by Alcoa to the shipper in this case which specifically incorporated the terms of its "long form of bill of lading". The respondent relies upon certain provisions of the long form. This document, in pertinent part, provides:

"RECEIVED by, or on behalf of, the Master of the vessel named overpage, from the Shipper named overpage, the goods or packages said to contain goods described overpage (weight, quality, quantity, contents and value being those declared by shippers and being unknown to Carrier) in apparent good order and condition, unless otherwise indicated in this bill of lading, TO BE TRANSPORTED subject to all the terms of this bill of lading with liberty to proceed via any port or ports within the scope of the voyage described herein to the Port of Discharge from Ship named overpage, or as near thereto as the ship can safely get and leave, always afloat at all stages and conditions of water and weather, and there TO BE DELIVERED at the end of ship's tackle (where the Carrier's responsibility shall cease) to the consignee named on the back hereof (or to the holder hereof if this be an order bill of lading), OR, from said port of discharge, TO BE TRANSSHIPPED by the Carrier as forwarding agent for the shipper and/or consignee to the Destination of the Goods named overpage for delivery to the said consignee or holder of this bill of lading, subject always to the

"TERMS OF THIS CONTRACT WHICH ARE HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

"(A) This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any

term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

\* \* \*

"(C) The Carrier's responsibility in respect of the goods as a carrier shall not attach until the goods are actually loaded for transportation upon the ship and shall terminate without notice as soon as the goods leave the ship's tackles at the Port of Discharge from Ship or other place where the Carrier is authorized to make delivery or end its responsibility. Any responsibility of the Carrier in respect of the goods attaching prior to such loading, or continuing after leaving the ship's tackles as aforesaid, shall not exceed that of an ordinary bailee, and, in particular, the Carrier shall not be liable for loss or damage to the goods due to flood; fire, as provided elsewhere in this bill of lading; falling or collapse of wharf, pier or warehouse; robbery, theft or pilferage; strikes, lockouts or stoppage or restraint of labor from whatever cause, whether partial or general; any of the risks and causes mentioned in paragraphs (a), (c) to (i), inclusive, and (k) to (p), inclusive, of subdivision 2 of section 4 of the Carriage of Goods by Sea Act of the United States; or any risks or causes whatsoever, not included in the foregoing, and whether like or unlike those hereinabove mentioned, where the loss or damage is not due to the fault or neglect of the Carrier. If the goods in whole or in part are shut out from the ship named herein for any cause, the Carrier shall have liberty to forward them under the terms of this bill of lading on the next available ship.

"1. The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier. The Carrier shall be entitled to the full benefit of, and right to, all limitations of, or exemptions from, liability authorized by any provisions of Sections 4281 to 4286 inclusive, of the Revised Statutes of the United States, and of any amendments, supplements or reenactments thereof and of any other provisions of the laws of the United States or of any other country whose laws shall apply. If the ship is not owned by or chartered by demise to Alcoa Steamship Company, Inc. (as may be the case notwithstanding anything that appears to the contrary) this bill of lading. shall take effect only as a contract with the owner or demise charterer, as the case may be, as principal, made through the

85

agency of Alcoa Steamship Company, Inc. which acts as agent only and shall be under no personal liability whatsoever in respect thereof. If, however, it shall be adjudged that any other than the owner or demise charterer is carrier and/or bailee of the goods all limitations of and exonerations from liability provided by law or by the terms hereof shall be available to such other.

"2. In this bill of lading the word 'ship' shall include any substituted vessel, and any craft, lighter or other means of conveyance owned, chartered or operated by the Carrier used in the performance of this contract; the word 'Carrier' shall include the ship, the time charterer, and any substituted carrier, whether the owner, operator, charterer, or master shall be acting as carrier or bailee; the word 'shipper' shall include the person named as such in this bill of lading and the person for whose account the goods are shipped; the word 'consignee' shall include the holder of the bill of lading, properly endorsed, and the receiver and the owner of the goods; the word 'charges' shall include freight and all expenses and money obligations incurred and payable by the goods, shipper, consignee, or any of them.

\* \* \*

"12. The port authorities are hereby authorized to grant a general order for discharging immediately upon arrival of the ship and the Carrier without giving notice either of arrival or discharge, may discharge the goods directly they come to hand, at or onto any wharf, craft or place that the Carrier may select, and continuously Sundays and holidays included, at all such hours by day or by night as the Carrier may determine no matter what the state of the weather or custom of the port may be. Delivery of the goods shall be received by the consignee directly from ship's tackle as the goods come to hand in unloading or as soon as available if discharged on Carrier's wharf. The Carrier shall not be liable in any respect whatsoever if heat or refrigeration or special cooling facilities shall not be furnished during loading or discharge or any part of the time that the goods are upon the wharf, craft, or other loading or discharging place. All lighterage and use of craft in discharging shall be at the risk and expense of the goods. Landing and delivery charges and pier dues shall be at the expense of the goods unless included in the freight herein provided for. If the goods are not taken away by the consignee by the expiration of

86

the next working day after the goods are at his disposal, the goods may at Carrier's option and subject to Carrier's lien, be sent to store or warehouse or be permitted to lie where landed, but always at the expense and risk of the goods. The responsibility of the Carrier in any capacity shall altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities. The Carrier shall not be required to give any notification of disposition of the goods.

"13. The Carrier does not undertake to lighter the goods from or to shore at any port. Lighterage at all ports shall be at the risk of the goods, and any lighterage charges, whether separately stated or included in the steamship freight, are received for disbursement, for account of shipper and consignee, to the lighterage concerns performing the lighterage. In receiving and disbursing lighterage charges, and in employing or appointing the lightermen and/or contractors, the Carrier acts solely as agent for shipper and consignee and is not responsible for the character, condition or seaworthiness of the lighters, or any fault or negligence of the lightermen, the Carrier's responsibility being strictly limited to its own line. The expense of lighterage at Haitian ports is not included in the steamship freight but is a separate charge to be borne by the shipper and consignee.

* * *

"19. In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

"Whenever the value of the goods is less than $500 per package or other freight unit, their value in the calculation and adjustment of claims for which the Carrier may be liable shall for the purpose of avoiding uncertainties and difficulties in fixing value be deemed to be the invoice value, plus freight and insurance to the extent that they are paid and irrecoverable, irrespective of whether any other value is greater or less.

"An article or piece of merchandise which is not crated, boxed or packaged shall nevertheless be considered a separate package or the customary freight unit for the purpose of determining the extent of the liability of the carrier under this clause and under Section 4(5) of the Carriage of Goods by Sea Act, notwithstanding anything to the contrary herein contained.

* * * "

To support its claim that the bill of lading shows an intent to give it the benefit of the limitation of liability the respondent relies upon the last sentence of paragraph (C) 1 which reads:

". . . If, however, it shall be adjudged that any other than the owner or demise charterer is carrier and/or bailee of the goods all limitations of and exonerations from liability provided by law or by the terms hereof shall be available to such other."

The respondent's argument is that, being a carrier and/or a bailee of the goods from ship to shore, it belonged to the class designated by those terms in the quoted sentence and, since there is no limitation in the sentence as to the type of carrier and/or bailee which is referred to, any person, firm or corporation which is adjudged to be a carrier and/or a bailee at any time of the cargo which was the subject of the bill of lading is entitled to the limitation of liability provided for by paragraph (C) 19 of the bill of lading. I cannot accept this construction of the language, however, since it seems to me wholly to ignore the context in which it appears. Thus the preceding sentences of paragraph (C) 1, on which the sentence here in question is a gloss, clearly relate only to the carriage of goods contemplated by Alcoa, that is, from the time they are loaded upon its ship until

they leave the ship's tackles at the port of destination, and provide, inter alia, for the situation where the ship actually performing this service is not owned by or demise chartered to Alcoa. It seems clear to me that the function of the sentence in question is merely to provide that if it shall be found that someone other than the owner or demise charterer of the ship by which the contemplated carriage is being performed is actually in law the carrier and/or bailee of the goods that other person shall also be entitled to the limitation of liability available to the carrier under the bill of lading. Moreover, the intended meaning of the sentence in question is illuminated by the definitions contained in paragraph (C) 2 of the bill of lading in which "ship" is defined to "include any substituted vessel, and any craft, lighter or other means of conveyance owned, chartered or operated by the Carrier used in the performance of this contract", and the word "Carrier" is defined to "include the ship, her owner, master, operator, demise charterer, and if bound hereby the time charterer, and any substituted carrier, whether the owner, operator, charterer, or master shall be acting as carrier or bailee".

■ My conclusion is that the last sentence of paragraph (C) 1 cannot fairly be construed to express an intention to extend the benefits of the limitation of liability clause of the bill of lading to a third party who transports the goods after they have left the tackles of the ship which transported them from the port of origin to the port of destination. To hold otherwise would extend the limitation of liability provisions of the bill of lading even to carriers and/or bailees handling the cargo by land. It is obvious to me that this was not intended. My conclusions are fortified by paragraph (C) of the bill of lading which, in pertinent part, provides:

"The Carrier's responsibility in respect of the goods as a carrier shall not attach until the goods are actually loaded for transpor-

89

tation upon the ship and shall terminate without notice as soon as the goods leave the ship's tackles at the Port of Discharge from Ship or other place where the Carrier is authorized to make delivery or end its responsibility. Any responsibility of the Carrier in respect of the goods attaching prior to such loading, or continuing after leaving the ship's tackles as aforesaid, shall not exceed that of an ordinary bailee . . ."

■ It will be observed that in paragraph (C) 13 of the bill of lading the parties dealt with the matter of lighterage. Under that paragraph the employment of a lighterman by the carrier was to be solely as agent for the shipper and consignee, and lighterage was at the "risk of the goods". In this regard, the respondent had the status of a private carrier, liable for a loss if negligence were proved against it. Commercial Corp. v. N. Y. Barge Corp., 1941, 314 U.S. 104, 110, 62 S. Ct. 156, 86 L. Ed. 89; The Bowling Green, E.D.N.Y. 1935, 11 F. Supp. 109, 111. See, also Knauth, Ocean Bills of Lading, 4th ed. 1953, pp. 231-236, and Annotation, 175 A.L.R. 8. The negligence of the respondent having been established, any limitation of its liability for damages caused by its own negligence would have to be spelled out in the agreement for lighterage services entered into with Alcoa as agent for the shipper and consignee. Under such circumstances, limitation of liability is not to be implied. As the Court of Appeals for the Fourth Circuit pointed out in Herd & Co. v. Krawill Machinery Corp., 1958, 256 F.2d 946, 949, affirmed 1959, 359 U.S. 297, 79 S. Ct. 766, 3 L. Ed. 2d 820, in rejecting the claim of a stevedore that by inference the liability-limiting provision in a bill of lading applied to it, "on the eastern seaboard, stevedores base their charges upon such factors as weight, difficulty of handling, etc., and do not, like the carrier, offer a choice of rates in which the declared value of the cargo and the amount of possible liability is considered in fixing the charge." This principle is equally applicable here for the respondent makes no claim that it offered

any choice of rates or that limitation of its liability was a factor in fixing the rates for its services for lighterage. Nor does it assert any other basis upon which its liability for negligence should be limited. It follows that judgment must be entered against the respondent for the full amount of the damages, $27,821.48.

 I turn then to the question of the amount of interest to be included in the judgment. An admiralty court may in its discretion control the allowance of interest by fixing the rate of interest and the time from which it shall run. Gardner v. The Calvert, 3 Cir. 1958, 253 F.2d 395, cert. den. sub nom. Sound Steamship Lines, Inc. v. Gardner, 356 U.S. 960, 78 S. Ct. 997, 2 L. Ed. 2d 814; Annotation 36 A.L.R.2d 337. Under all the circumstances of this case I believe it just and accordingly hold that the respondent should pay interest at the rate of 6% per annum on the sum of $10,800.00 from July 22, 1958, the date the mandate came down from the Court of Appeals which determined its legal liability to pay not less than that sum. The judgment today entered will, of course, bear interest from its date at the legal rate.

A judgment will be entered in favor of the libellant and against the respondent in the sum of $28,631.48, with costs.