DE LAVAL TURBINE, INC., a California Corporation

v.

WEST INDIA INDUSTRIES, INC.; WEST INDIA SHIPPING CO., INC.; HEAVY LIFT SERVICES, INC.; and FRANK CATANACH, d/b/a ISLAND TRANSPORT

No. 73-2032

No. 73-2033

No. 73-2034

United States Court of Appeals
Third Circuit

Argued April 29, 1974

Filed June 21, 1974

221

IRWIN J. SILVERLIGHT, ESQ. (NICHOLS & SILVERLIGHT), St. Croix, V.I., *for De Laval Turbine, Inc., appellant in No. 73-2032 and appellee in Nos. 73-2033 and 73-2034*

ROBERT A. ELLISON, ESQ., St. Croix, V.I., *for West India Industries, Inc., appellant in No. 73-2033 and appellee in Nos. 73-2032 and 73-2034*

THOMAS ALKON, ESQ. (ISHERWOOD, COLIANNI & ALKON & BARNARD), St. Croix, V.I., *for Heavy Lift Services, Inc., appellant in No. 73-2034 and appellee in Nos. 73-2032 and 73-2033*

WARNER ALEXANDER, ESQ. (MERWIN, ALEXANDER & O'BRIEN), St. CROIX, V.I., *for appellee Catanach*

JOHN P. BURKE, JR., ESQ. (BRYANT, COSTELLO & BURKE), Christiansted, St. Croix, V.I., *for appellee West India Shipping Co., Inc.*

Before ALDISERT, ADAMS and GARTH, *Circuit Judges*

## OPINION OF THE COURT

GARTH, *Circuit Judge*

We are called upon to review the District Court's assessment of responsibility in a multi-party negligence and breach of contract action.

## I.

On or about February 17, 1969, plaintiff De Laval Turbine, Inc. (De Laval), a California corporation, entered into a contract of affreightment with defendant West India Industries, Inc. (Industries). Pursuant to this agreement, Industries contracted to transport De Laval's 16-ton generator from Palm Beach, Florida to the Gallows Bay dock in Christiansted, St. Croix, and thence to the job site of the Virgin Islands Water and Power Authority, a short distance from the dock. Paragraph 8 of the contract of affreightment contained a promise by Industries to secure liability insurance.[1]

The generator was transported to Christiansted on June 30, 1969 by defendant West India Shipping Co. (Shipping), a subsidiary of Industries and operator of Industries' vessels. Shipping, on behalf of Industries, contracted with defendant Heavy Lift Services, Inc. (Heavy Lift), a stevedoring corporation specializing in the on-

---

[1] Paragraph 8 provides, in part, that:

West India, or any subcontractor of West India as the case may be, receiving, consolidating, loading or discharging the cargo, or transporting the cargo from the Christiansted Port Docks Marine Terminal, St. Croix, shall further secure, maintain, and pay for Workmen's Compensation and Employer's Liability Insurance in accordance with the Laws of the State of Florida, The Virgin Islands, and including the Longshoremen's and Harbor Workers' Compensation Act, of the Laws of the United States, as may be applicable, and Comprehensive Liability Insurance, including Automobile Liability, in the following limits: Bodily Injury, $100,000 per person; $300,000 per accident; Property Damage, $100,000 per accident: $100,000 annual aggregate.

loading and off-loading of heavy cargo, to off-load the generator at St. Croix. Heavy Lift selected two of its experienced employees, Walter Hotaling and Floyd Miller, to meet Shipping's vessel (the Inagua Pilot) at St. Croix. Also involved in the unloading was stevedore Frank Catanach, d/b/a Island Transport. Defendant Catanach, as Shipping's agent in St. Croix, supplied equipment for the transportation of Shipping's cargo from the Christian-sted dock to the St. Croix destination.

Catanach owned two trailer bed trucks—a single axle trailer and a double axle trailer—that were apparently capable of transporting De Laval's generator to its desti-nation. When "general" cargo was loaded by Island Transport, Catanach ordinarily allowed his dock manager to determine which truck would be utilized in transport. On the other hand, when the cargo was not "general", Catanach preferred to make the truck allocation determi-nation for himself. Catanach did not regard De Laval's generator as "general" cargo and thus advised Hotaling (Heavy Lift's employee) that he wished to be present when the generator was off-loaded.

Hotaling failed to advise Catanach of the time of the off-loading. In the absence of his employer, Island Trans-port's dock manager selected the single axle flatbed trailer for the De Laval generator. With Hotaling operating the crane, the generator was lowered onto the single axle trailer some time during the day of July 1, 1969. Hotaling positioned the generator towards the front of the trailer. An Island Transport employee suggested that the equip-ment be positioned closer to the rear, but Hotaling rejected this advice upon the urging of Catanach's truckdriver. The driver then began to back the trailer away from shipside. In the course of this maneuver, the generator slipped off the trailer and was virtually destroyed.

The instant litigation ensued. Bringing this action pursuant to the Virgin Islands District Court's general jurisdiction,[2] De Laval sought to recover for the loss of its generator on a number of theories. In Count I, De Laval sought recovery against Industries for failure to perform the affreightment contract. In Count 2, De Laval sought recovery from the same defendant for breach of its promise to obtain insurance. In Count 3, De Laval sued Industries, Shipping, Heavy Lift, and Catanach in a negligence cause of action. As might be expected, the defendants filed numerous cross-claims. Heavy Lift cross-claimed against each of the other defendants; Shipping cross-claimed against Catanach and Heavy Lift; Catanach cross-claimed against the three other defendants and counter-claimed against De Laval; and Industries cross-claimed against Catanach and Heavy Lift.

The case was tried to the Court without a jury. Midway through the trial, plaintiff's complaint as against Shipping was dismissed. Upon completion of the trial, the District Court entered a memorandum opinion and order in which the Court found that:

(a) Industries was liable to De Laval for breach of a promise to insure the generator;

(b) Heavy Lift (on a theory of respondeat superior) and Catanach negligently caused the accident and accordingly were liable to De Laval; and

(c) Through its contractual arrangements with Industries, De Laval limited Catanach's liability to $500.

In addition, Judge Christian dismissed all cross-claims (and the counter-claim, sub silentio). After declaring that the evidence foreclosed all cross-claims against Shipping, the Court stated with regard to the three other defendants:

For the reason that I deem consideration of [defendants] comparative negligence inappropriate, and further because I find that

---

[2] See 48 U.S.C. § 1612.

they are interlocked, so to speak, in their negligence, their several cross-claims all fail.

Judgment was entered on September 28, 1973.[3]

Heavy Lift appeals from the District Court's final judgment, contending that the Court erred: (1) in admitting the testimony of a particular expert witness, (2) in failing to conclude that De Laval had agreed (with Industries) to limit Heavy Lift's liability to $500, and (3) in dismissing its cross-claims. In addition, two cross-appeals have been filed. De Laval claims that the Court erred in limiting Catanach's liability to $500, and Industries claims that as an insurer, its liability cannot exceed the liability of its agent, Catanach. We hold that the District Court acted appropriately in admitting the testimony of the expert and in refusing to limit Heavy Lift's liability. However, we also find that the Court erred in limiting Catanach's liability[4] and in summarily dismissing Heavy Lift's cross-claim against Catanach. Pursuant to this Court's decision in Gomes v. Brodhurst,[5] we remand for a determination of the comparative negligence of Heavy Lift and Catanach.

## II.

Pursuant to Fed. R. Civ. P. 16, the sixth paragraph of the District Court's pretrial order provided that:

The names, addresses and general subject matter of testimony of witnesses shall be reported to opposing counsel at least ten days prior to trial. This restriction shall not apply to rebuttal witnesses, the necessity of whose testimony cannot reasonably be anticipated before the time of trial.

---

[3] Although some minor discrepancies appear between the judgment and opinion, they are irrelevant to the claims raised on appeal.

[4] Our disposition in this regard makes it unnecessary for us to resolve Industries "insurer" claim. See fn. 16, infra.

[5] 394 F.2d 465 (3d Cir. 1967).

This provision was honored solely in its breach: none of the parties exchanged witness lists prior to trial.

At trial, defendant Catanach proferred the testimony of one Lester Manhoo. Mr. Manhoo, a crane operator, testified (as an expert witness) that if he had been in Hotaling's position, he would not have allowed the De Laval generator to remain on a single axle trailer. Heavy Lift sought to bar this testimony, claiming that the calling of an unlisted witness contravened the pretrial order and prejudiced its case. Recognizing that no counsel had complied with the sixth paragraph of the pretrial order, the Court denied Heavy Lift's application.

██ On appeal, Heavy Lift renews its claim that it was error for the Court to permit contravention of its pretrial order by admitting the testimony of Lester Manhoo, an unlisted witness. It is certainly true that the District Judge had the power to exclude the testimony by reason of Catanach's failure to obey the pretrial order. See Southard v. Independent Towing Co., 453 F.2d 1115, 1119–1120 (3d Cir. 1971); LaMorte v. Penn Central Transportation Co., 450 F.2d 956, 957 (3d Cir. 1971) (per curiam). However, the determination as to whether or not parties should be held to pretrial orders is a matter for the discretion of district judges. See Moore v. Sylvania Electronic Products, Inc., 454 F.2d 81, 84 (3d Cir. 1972); Southard v. Independent Towing Co., supra, 453 F.2d at 1119-1120; Martella v. Great Atlantic & Pacific Tea Co., 418 F.2d 1246, 1247 (3d Cir. 1969) (per curiam); cf. Thomas v. E. J. Korvette, 476 F.2d 471, 476 (3d Cir. 1973) (reversing in part for failure to require compliance with a pretrial order, but noting that such determinations are normally a matter of discretion for the District Court). Unless there is a clear abuse of discretion, this Court will not interfere with such determinations. See Ely v. Reading

Co., 424 F.2d 758, 763-764 (3d Cir. 1970). We perceive no such abuse of discretion in the instant case.[6]

█ We note, however, that even if there had been an abuse of discretion, the same would not constitute reversible error. It is well settled that in a non-jury case, an appellate court will not reverse on the basis of an erroneous admission of evidence unless (1) there is insufficient evidence other than the challenged evidence to support the district court's conclusion, or (2) the district court is induced by the challenged evidence to make an essential finding that it would not have made otherwise. See Cain v. Commissioner of Internal Revenue, 460 F.2d 1243, 1244 (5th Cir. 1972) (per curiam); Holt v. Sarver, 442 F.2d 304, 307 (8th Cir. 1971); Caldwell v. Craighead, 432 F.2d 213, 219 (6th Cir. 1970) cert. denied 402 U.S. 953 (1971); Herlihy Mid-Continent Company v. Northern Indiana Public Service Co., 245 F.2d 440, 444–445 (7th Cir.) cert. denied 355 U.S. 894 (1957); Pursche v. Atlas Scraper and Engineering Co., 300 F.2d 467, 487–488 (9th Cir. 1961) cert. denied 371 U.S. 911 (1962); Baumel v. Travelers Insurance Co., 279 F.2d 780, 783, n. 4 (2d Cir. 1960); cf. Martella v. Great Atlantic & Pacific Tea Co., supra, 418 F.2d at 1247. Our review of the record convinces us that even without Manhoo's testimony, the record amply supports both the District Court's finding that Hotaling was negligent and its conclusion that Heavy Lift was liable on a theory of respondeat superior. We are similarly convinced that the Court would have reached these results even if Manhoo had not testified.

Accordingly, we conclude that the Court did not commit reversible error by permitting Manhoo to testify.

---

[6] Any claim of prejudice (surprise) is belied by the fact that Heavy Lift's counsel did not request a continuance when Manhoo was called as a witness. Cf. United States v. Somers, Nos. 73-1523 through 1526 (3d Cir. filed March 27, 1974).

## III.

■ Section 4(5) of the Carriage of Goods by Sea Act ("COGSA") provides that:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. § 1304(5). While this provision would apply in general to the transportation of De Laval's generator, it does not operate to limit the liability of Heavy Lift and Catanach.[7] The limitation of liability provision is made applicable only to carriers and ships. The term "carrier", in turn, is defined as including "the owner or the charterer who enters into a contract of carriage with a shipper." 46 U.S.C. § 1301(a). Stevedores and agents do not fit within this definition, and accordingly are not covered by the COGSA limitation of liability provision. See Herd & Company v. Krawill Machinery Corp., 359 U.S. 297, 301–3 (1959).

■ Both Heavy Lift and Catanach concede that COGSA does not expressly limit their liability. They contend, however, that De Laval agreed contractually with Industries to limit their liability. This contention is well sanctioned by contract law: parties to a bill of lading or contract of affreightment may extend the $500 COGSA limitation of liability to third parties. See Herd & Company v. Krawill Machinery Corp., supra, 356 U.S. at 303–

---

[7] Section 4(5) would normally operate to limit the liability of Industries, inasmuch as it is a "carrier". In the special circumstances of this case, however, the limitation is not available to Industries. See fn. 16, infra.

5; Rupp v. International Terminal Operating Co., Inc., 479 F.2d 674 (2d Cir. 1973); Cabot Corporation v. S.S. Mormacscan, 441 F.2d 476, 478 (2d Cir. 1971) cert. denied sub nom John W. McGrath Corp. v. Cabot Corp., 404 U.S. 855 (1971); Virgin Islands Corp. v. Merwin Lighterage Co., 177 F.Supp. 810, 811 (D.V.I. 1956) (per Maris, J., sitting by designation). Any such extension, however, must be clearly expressed, Cabot Corporation v. S.S. Mormacscan, supra, 441 F.2d at 478 (viewing the bill of lading as a contract of adhesion), and will be strictly construed against the party seeking protection, Bernard Screen Printing Corporation v. Meyer Line, 464 F.2d 934, 936 (2d Cir. 1972) (per curiam). Thus, in Herd, the Supreme Court announced the applicable guidelines as follows:

> ". . . [C]ontracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they 'are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties.'"

359 U.S. at 305.

Applying the above principles, the District Court found that De Laval had clearly expressed an intent to limit Catanach's liability, but had not agreed to similarly protect Heavy Lift. Accordingly, the Court limited Catanach's exposure to De Laval to $500, while holding that Heavy Lift's liability extended to the full amount of plaintiff's damages, $80,548.96.[8] De Laval's cross-appeal and Heavy Lift's appeal require us to review both of these conclusions.

## A. The Documents

Paragraphs 1 and 2 of De Laval's bill of lading provide, in pertinent part, that:

---

[8] Industries' liability for its breach of contract was also held to extend to the full amount of plaintiff's damages. See fn. 16, infra.

1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier. The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier. If this bill of lading is issued in a locality where there is in force a Carriage of Goods by Sea Act or Ordinance or Statute of a similar nature to the International Convention for the Unification of Certain Rules Relating to Bills of Lading at Brussels of August 25, 1924, it is subject to the provisions stated in such Act, Ordinance and rules thereto annexed which may be in effect where this bill of lading is issued.

(a) The carrier shall be entitled to the full benefit of, and right to all limitations of or exemption from liability authorized by any provisions of sections 4281 to 4286 of the Revised Statutes of the United States and amendments thereto and of any other provisions of the laws of the United States or of any other country whose laws shall apply. . . . If, however, it shall be adjudged that any other than the owner or demised charterer is carrier and/or bailee of the goods all limitations and exonerations from liability provided by law or of the terms hereof shall be available to such other.

2. In this bill of lading the word "ship" shall include any substituted vessel or any craft, lighter or other means of convenience owned, chartered or operated by the carrier used in the performance of this contract; *the word "carrier" shall include the ship, her owner, master, operator, demised charterer and if bound hereby the time charterer and any substituted carrier whether the owner, operator, charterer or master shall be acting as carrier or bailee.* (Emphasis added.)

## Paragraph 17 of the bill of lading provides that:

In case of any loss or damage to or in connection with goods

exceeding in actual value $500 lawful money of the United States per package, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

Whenever the value of the goods is less than $500 per package or other freight unit, their value in the calculation and adjustment of claims for which the Carrier may be liable shall for the purpose of avoiding uncertainties and difficulties in fixing value, plus freight and insurance if paid, irrespective of whether any other value is greater or less.

Paragraph 2 of De Laval's contract of affreightment provides that:

2. *Carriage of Cargo:* De Laval shall furnish the cargo. . . . at the port of Palm Beach, Florida. West India [herein Industries] shall furnish the vessel and trailers and transport the cargo above deck from said port to port of discharge Christiansted, St. Croix, Virgin Islands, and thence by trailer bed to alongside jobsite foundation or as near thereto as is reasonably accessible by trailer bed and equipment at the Christiansted plant site of the St. Croix generating plant extension, Virgin Island Water and Power Authority Project.

Paragraph 4 (c) of the contract provides that:

(c) Cargo will be discharged from trailer bed at jobsite by De Laval at its risk and expense as expeditiously as possible, but not to exceed eight (8) running hours per trailer load. Time used in excess of eight (8) hours would be subject to demurrage at the rate of $25.00 per hour or part thereof.

Finally, paragraph 7 of the contract of affreightment provides that:

*Bill of Lading:* West India form of Bill of Lading (per specimen attached) is to be used either in non-negotiable form reflecting De Laval as sole shipper and consignee or in negotiable form suitably claused as subject to this agreement. Provisions of such form of Bill of Lading are incorporated herein to the extent any provisions of this agreement are not patently and directly inconsistent therewith; such Bill of Lading provisions as would be so incorporated but for mention of "Bill of Lading" shall be deemed to contemplate this contract. It is expressly agreed that this Contract of Affreightment is subject to the following clause, which is to be included in all Bills of Lading issued hereunder:

### U.S.A. Clause Paramount:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

## B. Heavy Lift

The District Court's conclusion that Heavy Lift must bear full liability was based primarily upon the rationale of Cabot Corporation v. S.S. Mormacscan, 441 F.2d 476 (2d Cir.) cert. denied sub nom. John W. McGrath Corp. v. Cabot Corp., 404 U.S. 855 (1971) and Rupp v. International Terminal Operating Co., Inc., 479 F.2d 674 (2d Cir. 1973).

In Cabot, a negligent stevedore claimed that a bill of lading entitled it to a $500 limitation of liability. The bill of lading contained a limitation provision virtually identical to paragraph 17 of De Laval's bill. Similarly, the definition of "carrier" in the Cabot bill of lading tracked paragraph 2 of De Laval's bill, except that the Cabot bill

also protected "all persons rendering services in connection with performance of this contract."[9] 441 F.2d at 478. Reasoning that one "can only guess" whether the limitation provision incorporates all categories specified in the definition of "carrier" and whether that definition of carrier can be construed to include a stevedore, the Second Circuit held that the Cabot bill of lading did not clearly express an intention to limit the stevedore's liability. The Court explained its conclusion as follows:

> While there is no doubt that the parties to a bill of lading may extend a contractual benefit to a third party by clearly expressing their intent to do so, Herd & Co. v. Krawill Machinery Corp., supra at 302, 79 S.Ct. 766, an intention to extend benefits of the limitation in the present bill to the stevedore would most naturally have been expressed by the addition of the term "stevedore" to the long list of various persons included under the definition of "carrier" in clause 2. In Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc., 275 F.Supp. 76 (S.D.N.Y.), aff'd per curiam, 386 F.2d 839 (2d Cir. 1967), cert. denied sub nom. Carle & Montanari v. John W. McGrath Corp., 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968), the benefit of the $500.00 limitation was extended to the same stevedore involved here, but the bill of lading included the language "all agents and all stevedores." 275 F.Supp. at 78. The failure to include similar language here would lead one to believe that the protection of stevedores against liability was not intended. In any case such an intention was not expressed with sufficient "clarity of language."
>
> We will "not stretch the language when the party drafting such a form contract has not included a provision it easily might have." The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180, 183, 79 S.Ct. 710, 712, 3 L.Ed.2d 723 (1959).

441 F.2d at 478–479. Construing the same bill of lading two years later, the Second Circuit reaffirmed Cabot in Rupp v. International Terminal Operating Co., Inc., supra.

---

[9] Clause 2 of the Cabot bill of lading defined "carrier" as: "the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether acting as carrier or bailee, *and all persons rendering services in connection with performance of this contract.*" 441 F.2d at 478. (Emphasis added.)

234

We find the Second Circuit's reasoning to be sound and persuasive. Had De Laval and Industries intended to protect Heavy Lift, the most logical method of doing so would have been to include the term "stevedore", or a phrase clearly and specifically referring to the stevedoring function,[10] within the bill of lading's definition of a "carrier". The parties did not do so.[11] In the absence of such a provision, Herd places a heavy burden upon Heavy Lift to point to other language in the documents which clearly and concisely extends the limitation of liability to the stevedore.

In support of its provision, Heavy Lift does no more than allude to random and generalized terms in the bill of lading and contract of affreightment.[12] We hold that

---

[10] In Bernard Screen Printing Corp. v. Meyer Line, 464 F.2d 934 (2d Cir. 1972) (per curiam), the Second Circuit held that a stevedore came within a definition of "carriers" that included protection for "independent contractors." In Rupp, the Court explained that Bernard Screen was consistent with Cabot because stevedores could be *reasonably characterized* as independent contractors. 479 F.2d at 677. In the instant case, we find it difficult to reasonably characterize Heavy Lift within any of the categories listed in the bill's definition of a "carrier".

[11] We note that the definitional provision herein is even more limited than the Cabot and Rupp provisions, there being no general inclusion of "persons rendering services in connection with performance of this contract."

[12] Heavy Lift points to:
(a) the language in paragraph 1 of the bill of lading which provides that:
This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act . . . which shall be deemed to be incorporated herein . . . . The provisions stated in said Act . . . shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier.
(b) the statement in paragraph 2 of the contract of affreightment that Industries would "transport the cargo above dock from [Palm Beach] to port of discharge Christiansted, St. Croix, Virgin Islands, and thence by trailer bed to alongside jobsite foundation . . .";
(c) the reference in paragraph 4(c) of the contract of affreightment to the fact that "cargo will be discharged from trailer bed at jobsite by De Laval at its risk and expense as expeditiously as possible . . .";
(d) a statement in paragraph 5(d) of the contract which obligates De Laval to compensate Shipping for charges imposed by Heavy Lift for the discharge of additional cargo;
(e) the language in paragraph 8 of the contract of affreightment extending the insurance requirements of the agreement to ". . . any subcontractor of West India as the case may be, receiving, consolidating,

neither these provisions nor any other provision in the relevant documents, taken either individually or in combination, express with sufficient clarity an intent to limit Heavy Lift's liability. Accordingly, we agree with the District Court that Heavy Lift's liability should extend to the full amount of De Laval's damages.

## C. Catanach, d/b/a Island Transport

As with Heavy Lift, paragraph 2 of De Laval's bill of lading does not expressly include the overland transporter (Island Transport) within the definition of a carrier. At the very least, one would have to "guess" (cf. Cabot, supra) whether that paragraph referred to the services provided by Catanach. The mere fact that paragraph 2 does not refer to Catanach does not, however, end our inquiry. Although the burden is indeed heavy, Catanach can succeed if other language in the documents expresses a clear intent to limit his liability.

Catanach argues that the combined effect of the contract of affreightment and the bill of lading estabish the necessary clarity. The contract provides (in paragraph 2) that the cargo was to be transported from Palm Beach, Florida to the Virgin Islands Water and Power Authority Project. Since the bill of lading (in paragraph 1) limits liability after the generator was discharged from the ship, Catanach contends that the obvious intent was to protect the overland transporter just as the overseas carrier was protected. The District Court adopted and refined this argument, stating that:

The contract of De Laval and Industries necessarily contemplated the overland portion of the voyage. It might even be reasonable to infer, from the previous dealings of those parties, that it

loading or discharging the cargo, or transporting the cargo from the Christiansted Port Docks, Marine Terminal . . ."; and
(f) the definition of "ship" in paragraph 2 of the bill of lading as "any craft, lighter or other means of conveyance ·owned, chartered or operated by the carrier used in the performance of their contract. . . ."

236

was known that Catanach, on behalf of Industries, would be fulfilling that portion of the act of carriage, and to that extent, he was a person "bound" by the terms of the contract. True, there was no specific mention of Catanach or Island Transport but I cannot believe that to expressly extend the benefit, as Herd's mandate requires, the beneficiary must be mentioned by name. Surely, De Laval received a copy of the bill of lading before shipping the generator and its contract amply demonstrates that it knew that the generator would be carried overland from the dock in Gallows Bay to as close to the construction site of WAPA as practicable. Unquestionably, plaintiff had to know that the $500 limit would apply to that portion of the carriage, certainly if Industries or Shipping had used a trailer bed of their own for that purpose. But, as I have said, by past practice, it was fairly to be contemplated that an Island Transport trailer would be used.

We do not dispute the findings of fact underlying this passage. We do, however, dispute their legal significance. The District Court was not content with relying strictly upon the documentary provisions cited by Catanach (regarding the overland transport). Instead, the Court found it necessary to look to extrinsic sources (e.g. the likely expectation of De Laval) in order to reach its conclusion. While we recognize that evidence of prior dealings is generally admissible to explain the intent of contracting parties,[13] we understand Herd & Company v. Krawill Machinery Corp., supra, to preclude reliance upon such evidence in this context. It is inconsistent to require a clear expression of intent on the one hand while on the other resorting to extrinsic sources—of which the contracting parties may or may not have actually been aware—to interpret the documents. If the negotiating parties do not limit the liability of third parties within the "four corners" of the documents, we will not recognize an extension of COGSA protection. Accordingly, we cannot treat

---

[13] Cf. Uniform Commercial Code, § 1—205.

as dispositive the District Court's findings of fact with regard to the prior practices of De Laval.

■ Returning to the "four corners" of the documents, we recognize that the District Court did point to one other documentary provision to support its conclusion that Catanach was intentionally protected by De Laval. The Court noted, separate from its findings with regard to prior practices, that paragraph 1(a) of the bill of lading states that:

> "If, however, it shall be adjudged that any other than the owner or demised charterer is carrier and/or bailee of the goods all limitations and exonerations from liability provided by law or of the terms hereof shall be available to such other."

The District Court found this section applicable by determining that Catanach was a bailee.

For a variety of reasons, we conclude that the provision quoted above does not extend COGSA protection to Catanach.[14] First, we note that the term "other" is ambiguous. Does the term refer to any other person/business? Or is the term more limited, referring only to a particular class of persons (e.g. any other substituted carriers)? The bill of lading provides neither answers nor clues to these questions.

Secondly, we deem the term "bailee" too general a category to support a limitation of liability. The mere fact that Catanach may fit within the descriptive term is not determinative. See Cabot Corporation v. S.S. Mormacscan, supra, (denying a stevedore limited liability despite the

---

[14] In Virgin Islands Corp. v. Merwin Lighterage Co., 177 F.Supp. 810 (D.V.I. 1959), Judge Maris held that the identical provision did not extend COGSA protection to a company providing barge service between a point one mile from shore and the port. Unlike the instant case, the bill of lading in Merwin Lighterage was expressly limited to the period in which the transported goods were on board ship. Given this factual distinction, we do not rely upon Merwin Lighterage in reaching our conclusion.

fact that "carrier" was defined as "all persons rendering services in connection with performance of that contract"). Rather, there must be a specific link between the contract term and the party to be protected in order to satisfy the clarity requirement of Herd & Company v. Krawill Company. Absent such a link, courts cannot be confident that the contracting parties intended to extend COGSA protection. Given the substantial risks undertaken by a party who accedes to limitations of liability, we will not extend such limitations to third parties on the basis of mere speculation.

Finally, we doubt whether the District Court considered the above quoted provision as a sufficient ground, in and of itself, to justify protection of Catanach. Had the Court felt the provision to be sufficient alone, it no doubt would have extended the limitation of liability to Heavy Lift as well, since Heavy Lift was a bailee, albeit for only a short period of time. We note in this regard that Catanach, as appellee in De Laval's cross-appeal, did not even cite this "bailee" provision in his brief on the issue of limited liability.

The ambiguities in the "bailee" provision, and lack of specific identification therein, lead us to the conclusion that De Laval and Industries did not clearly express by that provision an intention to limit Catanach's liability. Rather than "stretch the language when the party drafting . . . a form contract has not included a provision it easily might have,"[15] we hold that neither the "bailee" provision nor any other documentary provision, alone or in combination with other provisions, clearly expresses an intention to protect parties which may transport the generator over land to its ultimate destination. Accordingly, we find

---

[15] See The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180, 183 (1959).

reversible error in the District Court's limiting Catanach to a liability of $500.[16]

## IV.

In Gomes v. Brodhurst, 394 F.2d 465 (3d Cir. 1967), this Court undertook an analysis of proportionate liability amongst joint tortfeasors under Virgin Islands law. We concluded that fairness requires that the right of contribution exist among joint tortfeasors. 394 F.2d at 467–468. We further held that liability among joint tortfeasors is to be imposed in proportion to their comparative negligence. 394 F.2d at 469–470. Heavy Lift contends that the District Court's rejection of its cross-claim against Catanach contravenes these principles. Catanach responds by charging that appellant failed to raise the Gomes issue before the District Court and therefore is estopped from arguing same on appeal.

We find no evidence in the record to suggest that Heavy Lift cited Gomes v. Brodhurst to the District Court. Nevertheless, we are satisfied that the issue was raised in the pleadings to an extent sufficient to avoid estoppel. In paragraph 7 of its cross-claim against Frank Catanach, Heavy Lift stated:

---

[16] In discussing Industries' liability, the District Court found that Industries' failure to procure insurance for De Laval "constitutes an unreasonable deviation from, and a fundamental breach of, the contract of carriage" (see Fn. 1) and precludes reliance upon the COGSA limitation of liability. See Encyclopedia Britanica v. S.S. Hong Kong Producer, 422 F.2d 7, 18 (2d Cir. 1969) cert. denied 397 U.S. 964 (1970); Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y. 1953). The Court therefore adjudged Industries liable for the full amount of De Laval's damages. On appeal, Industries does not challenge the District Court's theory of "unreasonable deviation" nor does it question the District Court's reliance upon the Hong Kong Producer case. (We therefore find it unnecessary to address ourselves either to the theory or to the applicability of the Hong Kong Producer case in this Circuit). Instead, Industries offers an alternate route by which its liability may be limited to $500. Rather than claim the limitation directly, Industries contends that as Catanach's insurer, it should be entitled to Catanach's limitation of liability. Our conclusion that De Laval did not limit Catanach's liability disposes of Industries' contention.

240

If defendant, Heavy Lift Services, Inc., be adjudged liable to any party herein, such liability being expressly denied, such liability will have been brought about and caused, in whole or in part, by the fault of the defendant, Frank Catanach, d/b/a Island Transport. Defendant, Frank Catanach d/b/a Island Transport should indemnify this defendant for an amount equal to the extent that any liability on the part of Heavy Lift Services, Inc. was caused, brought about or contributed to by Frank Catanach, d/b/a Island Transport, together with the costs and disbursements of this action including a reasonable amount for attorneys fees and disbursements.

The first sentence of this paragraph contains two allegations: in the alternative, Heavy Lift claims that Catanach was either wholly or partially responsible for the damage to the generator. By phrasing the allegation in the alternative, Heavy Lift in effect creates the framework for both indemnification and contribution claims.[17] This framework is completed in the second sentence when Heavy Lift requests compensation proportionate to the extent of Catanach's responsibility. We thus interpret Heavy Lift's position as either asking for (1) full compensation (indemnification) in the event that Catanach is wholly at fault, or (2) partial compensation (contribution) for Catanach's share of the responsibility. In short, we read paragraph 7 to claim that joint tortfeasor Catanach should respond to Heavy Lift to the extent of his comparative share of the negligence.

The general rule that matters must first be raised at the District Court level[18] is a cornerstone of a rational federal judicial system. As significant as the rule is, however, we see no reason to append to it a "magic word"

---

[17] Indemnification and contribution differ in the extent to which a tortfeasor is able to rid himself of liability. Where the entire liability shifts, indemnification is invoked; on the other hand, where liability is shifted only proportionately, contribution exists instead. See Prosser, Law of Torts, § 48 (3d ed. 1964). Heavy Lift's cross-claim contemplates a partial, as well as a full-scale, shift in liability.

[18] See, e.g., Andrews v. Chemical Carriers, Inc., 457 F.2d 636, 640 (3d Cir. 1972), cert. denied 409 U.S. 874 (1972).

requirement. Inasmuch as the right of comparative negligence is settled in the Virgin Islands, reference to the Gomes v. Brodhurst citation is not essential to the maintenance of a claim for contribution. We hold that this issue is raised sufficiently where, as here, the litigant requests that joint tortfeasors be "responsible" to the extent of their comparative negligence. We therefore reject Catanach's estoppel argument.

■ With regard to Heavy Lift's appeal, we have no difficulty in concluding that Gomes requires an allocation of liability according to the proportionate share of the joint tortfeasors' responsibility. Our problem lies in analyzing the steps already taken by the District Court. In its memorandum opinion, the District Court stated:

"For the reason that I deem consideration of their comparative negligence inappropriate, and further because I find that they are inter-locked, so to speak, in their negligence, their several cross-claims all fail."

It might be argued from the above that the District Court addressed itself to the issue of comparative negligence, finding equal responsibility as between the joint tortfeasors. Were we convinced that such an evaluation was made, there would be no need to remand the case. We cannot, however, disregard the Court's statement that a consideration of comparative negligence is "inappropriate." We conclude that the Court did not fully evaluate Heavy Lift's culpability vis-a-vis Catanach. On the basis of Gomes v. Brodhurst, we cannot *assume* equal responsibility, but instead must remand for findings of fact regarding comparative negligence. 394 F.2d at 470. If, upon review of the record, the Court concludes that Catanach and Heavy Lift were equally culpable, the judgment[19]

---

[19] To conform with our conclusions in Part III, it will be necessary in any event for the District Court to enter a new judgment.

242

should reflect this "50-50" position of Heavy Lift vis-a-vis Catanach. On the other hand, if the Court finds disproportionate responsibility, the judgment should reflect the comparative negligence of the joint tortfeasors.

The judgment herein will be reversed and the case remanded for further proceedings consistent with this opinion.

---

ALDISERT, *Circuit Judge*, concurring in part and dissenting in part.

I join in Parts I, II, and III A and B of the majority opinion. Because I would affirm the trial judge's conclusions as to Catanach, I do not join in Part III C. I agree with Chief Judge Christian's conclusion that the contracting parties intended to extend coverage of the COGSA limitation to Catanach. In so doing I rely on that portion of his opinion quoted by the majority (majority opinion, 14–15).[1] I do not read Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297 (1959), to preclude evidence of prior dealings to explain the intent of contracting parties. The law of contracts is still a stable discipline of the corpus juris. Nothing in the language of Herd[2] has the force to overrule basic concepts relied upon by so many, so often, and for so long. Cf., Restatement of Contracts §§ 235–236; 11A V.I.C. § 1—205 (Uniform Commercial Code).

---

[1] Paragraph 2 of the contract of affreightment (majority opinion, p. 10) clearly supports Judge Christian's conclusion that parties' contract contemplated the overland portion of the voyage.

[2] There is, thus, nothing in those provisions to indicate that the contracting parties intended to limit the liability of stevedores or other agents of the carrier for damages caused by their negligence. If such had been a purpose of the contracting parties it must be presumed that they would in some way have expressed it in the contract. Since they did not do so, it follows that the provisions of the bill of lading did "not cut off [respondent's] remedy against the agent that did the wrongful act." Sloan Shipyards Corp. v. Emergency Fleet Corp., 258 U.S. 549, 568.
 359 U.S. at 302. The Court was not called upon to consider the impact of prior dealings between the contracting parties.

But this does not mean I would affirm the judgment of the district court. Limiting Catanach's liability to $500.00 would of necessity limit the damages accruing to plaintiff by reason of West India Industries, Inc.'s failure to require that Catanach be covered by liability insurance. (See, majority opinion, note 16.) Had insurance been in force, the insurance carrier's liability would have been limited to $500.00. Accordingly, this should have been the extent of damages recoverable for breach of contract to provide insurance.

It is my view that Judge Christian fully addressed himself to the comparative negligence issue. The majority place too much emphasis on the word "inappropriate" and too little emphasis on Judge Christian's finding that the defendants were "interlocked, so to speak, in their negligence. . . ." This to me is a finding of equal responsibility.