Patricia BERROYER

v.

Sidney S. HERTZ, Appellant.

No. 80–2719.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1981.

Decided March 5, 1982.

William C. Murray (argued), O'Brien & Moore, Christiansted, St. Croix, U. S. V. I., for appellant.

James L. Hymes, III (argued), Grunert, Stout, Hymes & Smock, St. Thomas, U. S. V. I., for appellee.

Before HUNTER, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This is an appeal from a final judgment of the District Court of the Virgin Islands entered upon a jury verdict in favor of the plaintiff on her malpractice claim against the defendant dentist. The defendant alleges that the district court committed reversible error in (1) receiving the testimony of a plaintiff's witness whose name had not been included in the pretrial order or disclosed during discovery; (2) permitting that witness to be called as a "rebuttal witness" during the plaintiff's case in chief; and (3) submitting the question of punitive damages to the jury. This court has jurisdiction under 28 U.S.C. § 1291 (1976).

After a careful consideration of the contentions raised by the defendant and upon examination of the entire record, we conclude that the record does not support the award of punitive damages. Consequently, we will reverse so much of the judgment as awards punitive damages to the plaintiff, vacate the award of attorney's fees, and remand the case to the district court with instructions to enter judgment in favor of the defendant on the plaintiff's claim for punitive damages and to reconsider the attorney's fees award in light of this opinion. In all other respects, the judgment of the district court will be affirmed.

### I.

The plaintiff, Patricia Berroyer, visited the defendant, Dr. Sidney Hertz, for treatment of an impacted wisdom tooth. During this consultation, Hertz advised Berroyer that the tooth should be removed, in part because there was a possibility that it could lead to cancer of the jaw. Berroyer consented to the procedure and Hertz removed the tooth. Berroyer thereafter developed an infection in the area of the extraction and returned to Hertz's office on six or seven occasions for treatment. Subsequently, Berroyer consulted another dentist and then instituted this suit, claiming compensatory damages based upon Hertz's negligence and punitive damages based upon his contended outrageous conduct in inducing her to undergo the procedure with his allegedly fraudulent prediction that cancer could otherwise develop. The claimed grounds for punitive damages were later expanded to include Hertz's alleged "abandonment" of the plaintiff when he refused to see her on her final post-operative visit.[1]

At trial, the plaintiff's theory, which she sought to prove through expert testimony, was that the defendant's treatment of her,

1. As we will discuss in part IV of this opinion, we have not been able to discover where evidence of this aspect of the punitive damage claim was actually presented to the jury in the district court. Nonetheless, the plaintiff relied upon it in her brief here as an alternative basis for supporting the award and her counsel pressed it strongly at oral argument.

both pre-operative and post-operative, was negligent and that his cancer warning constituted intentional fraud which vitiated her consent and rendered the extraction a common law battery. The substance of the plaintiff's testimony was that the defendant told her that her impacted wisdom tooth, which was at that time "asymptomatic" or not presently troublesome, "ha[d] to come out.... Because if it doesn't come out, there is a 9 percent chance you will get cancer of the jaw." N.T. at 65. She further testified that she consented to the procedure in reliance upon the defendant's statement out of her "horror" of cancer of the jaw. After describing the surgery and the defendant's treatment of her various post-operative problems, she concluded by stating that on her final visit to Dr. Hertz she arrived without an appointment and discussed her concerns with the nurse, who relayed them to the defendant and returned with his answers. She further stated that she never made an explicit request to see the doctor personally because she "thought he would see me if he thought something was really wrong." N.T. at 82–84.[2] The plaintiff never returned to the defendant after this visit and sometime thereafter consulted another dentist. The plaintiff's experts then testified to their opinions concerning Dr. Hertz's treatment of the plaintiff. The only aspect of that testimony that is of concern here is the fairly consistent view held by these witnesses that the chance of cancer developing from an impacted wisdom tooth was certainly not 9% and was in fact so remote that warning a patient about it is a deviation from the standard of dental care practiced in the Virgin Islands. *See* N.T. at 205–10.

During the course of the plaintiff's case, the defendant sought permission to call his expert witness, Dr. Shira, out of turn in order to accommodate the witness's travel schedule. The plaintiff did not object and Dr. Shira testified that, in his opinion, the failure to remove an impacted wisdom tooth can cause cysts to form in the jaw, which cysts may, in a limited number of cases, become cancerous. He went on to say that he had presented a paper on this topic at a dental seminar on St. Thomas in which he suggested this possibility as just another of many reasons why wisdom teeth should be removed. Dr. Shira further testified that, in his opinion, Dr. Hertz had acted reasonably both in his advice and post-operative treatment of the plaintiff. He based the latter opinion on his belief that Dr. Hertz had prescribed "Wygesic," a very mild analgesic pain medication, which indicated that the plaintiff's infection could not possibly have been as serious as she claimed.

Following Dr. Shira's testimony, the plaintiff sought permission to call Elliot Thomas, the pharmacist who filled her prescriptions, in "rebuttal" to Dr. Shira's testimony. The defendant objected on the ground that Mr. Thomas' name had not

---

2. The plaintiff's precise testimony was:

"Q Now, what happened on this time, July 8th, when you went to his office? You didn't see him? Please describe to the court and jury what happened on that day.

"A I was with my oldest daughter and she helped me in and we went in and the nurse was behind the desk and I said, I don't feel well and I think I have one hell of an infection; I put myself on Tetracycline, would you ask the doctor please what I should do? I had Tetracycline at home.

.    .    .    .    .

"A [Continuing] I knew something was wrong and I needed some kind of medication different from what I was taking.... She went to see the doctor and when she came back a few minutes later she said the doctor said to stay on the Tetracycline for two weeks. I said, but I keep passing out every time I stand up. She said, that is because you're not eating enough. I said, how can I eat; I can't open my mouth? She said, you can eat things like applesauce, cottage cheese and milkshakes.

.    .    .    .    .

"Q Did you have any conversation with Mrs. Hertz [the nurse] that day about wanting to see the doctor?

"A No, I didn't. I just kind of took it for granted he would see me, I guess. I think I just took it for granted he would see me.

"Q You what?

"A I thought he would see me if he thought something was really wrong."

N.T. at 82–84.

been on the pretrial order witness list[3] and that it was improper to permit rebuttal testimony before the close of defendant's case. The plaintiff responded that Mr. Thomas had his own travel problems, that his testimony would be in direct rebuttal to Dr. Shira's, and that permitting his testimony could cause no prejudice to the defendant. The court overruled the objection and Mr. Thomas testified that the plaintiff had never presented him with a prescription for "Wygesic," but rather had, on the prescription of the defendant, purchased "Percodan," a strong pain killer. The plaintiff's expert witnesses had already testified that "Percodan" merely masks severe pain and does nothing to treat the cause. This testimony was the basis for the plaintiff's argument that the defendant knew of the severity of her pain and infection and was negligent in continuing to prescribe a pain killer without treating the underlying cause of the pain.

The defendant testified that he had attended Dr. Shira's presentation on St. Thomas and, based upon that, informed the plaintiff that one of several reasons to have an impacted wisdom tooth removed was the possibility of cancer. He denied telling her that there was a 9% chance of cancer but, rather, maintained that he had said that there was approximately a 3% chance of a cyst developing and then another 3% chance that, if the cyst developed, it would become cancerous. Thus, he stated that he told Ms. Berroyer that there was roughly a .09% (i.e., $.03 \times .03 = .0009 = .09\%$) chance of cancer but that "even if it were one in a million" it would be too much. N.T. at 430–31. He acknowledged that, in hindsight and based on Dr. Shira's testimony, even the .09% figure was too high but insisted that he had always qualified his statement to the plaintiff by saying that any risk of cancer, even "one in a million," was an unnecessary risk to run when removing the tooth was relatively simple.

At the close of the evidence, the court submitted the case to the jury on special interrogatories[4] and informed them that

**3.** There is some indication, however, that the plaintiff's counsel gave notice of his intention to call Mr. Thomas at the close of the previous day's testimony (N.T. at 239).

**4.** The form of verdict was as follows:
"VERDICT OF JURY
"The Jury is requested to answer the following questions:
"1. Do you find that the defendant SIDNEY S. HERTZ was negligent in the diagnosis and or treatment of the plaintiff PATRICIA BERROYER?
(As your answer to the Question, please circle 'YES' or 'NO' as the case may be.)
"2. Do you find that the defendant SIDNEY S. HERTZ knowingly made a false representation to the plaintiff PATRICIA BERROYER, as to whether or not she would or might develop cancer, if the impacted wisdom tooth were not removed, based upon which said knowingly false representation plaintiff gave her consent to the extraction of the tooth in question?
(As your answer to the Question, please circle 'YES' or 'NO' as the case may be.)
(If your answer to *each* of the above two (2) Questions is 'NO' please sign the verdict form and return to the Courtroom. If your answer to *either* or *both* of the above question is 'YES' proceed to answer the next question.)

"3. If your answer to either Question No. 1 or Question No. 2 or both of them is 'YES' do you find that such negligence and or knowing false representation was a proximate cause to the injuries or damages, if any, suffered by plaintiff?
(As your answer to the question, please circle 'YES' or 'NO' as the case may be.)
(If your answer to Question No. 3 is 'NO' please sign the verdict form and return to the Courtroom. If your answer to the above question is 'YES' proceed to answer the next question.)
"4. What is the sum of money that you find will fairly, adequately and reasonably compensate the plaintiff PATRICIA BERROYER for the injuries and damages which you have found she suffered?
"$_____"
If, and *only if,* you have made an award of compensatory damages to plaintiff, answer the following questions:
"5. If you have found above that defendant made the knowing false representation to plaintiff on which she relied, do you also find that the false representation was made wantonly, recklessly and in disregard of the rights of plaintiff?
(Please circle 'YES' or 'NO', as the case may be.)
(If your answer to the above is 'NO', sign the verdict form and return to the Court-

they could award both compensatory and punitive damages.

The jury answered "YES" to each interrogatory and awarded the plaintiff $15,000.00 in compensatory and $25,000.00 in punitive damages. Thereafter, the district court denied the defendant's motion for judgment notwithstanding the verdict, granted the plaintiff's motions for costs and attorney's fees,[5] and entered judgment in the total amount of $50,620.00 plus interest.

## II.

■ The defendant's first contention is that the district court erred in permitting Mr. Thomas to testify despite the fact that his name was not on the witness list in the pretrial order. The cases make clear that departure from or adherence to the pretrial order is a matter peculiarly within the province of the trial judge, whose decision will not be disturbed on appeal absent a clear abuse of discretion. *De Laval Turbine, Inc. v. West India Industries, Inc.*, 502 F.2d 259, 263 (3d Cir. 1974) (permitting testimony by a non-listed witness). *Cf. Franklin Music v. American Broadcasting Companies*, 616 F.2d 528, 539–40 (3d Cir. 1979) (upholding trial court's exclusion of non-listed witness as within its discretion); *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 903–05 (3d Cir. 1977). Nonetheless, it is clear that "exclusion of critical testimony by unlisted witnesses is disfavored...." *Franklin Music v. American Broadcasting Companies*, 616 F.2d at 539.

In *Meyers*, this court distilled the applicable cases into four principal criteria for making and evaluating this discretionary judgment:

> "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule

against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order."

559 F.2d at 904–05. An application of these standards to the facts of this case convinces us that there is no clear abuse of discretion shown on this record.

■ First, the defendant's fundamental objection, and the only one noted on the record at trial (N.T. at 363), is unfair surprise. The record discloses, however, that counsel for the plaintiff gave notice at the close of the first day of trial that he had an unlisted rebuttal witness whom he wished to call and identified the witness, although not by name, as "a pharmacist at the Medical Arts Complex" (N.T. at 239). Defendant's counsel made no objection but, rather, went on to discuss the witnesses he proposed to call and again requested permission to call his principal expert out of turn the next morning. Mr. Thomas, the pharmacist, did not testify until the afternoon of the second day of trial. Therefore, the defendant had at least some notice and an opportunity to cure any prejudice. In addition, the only unfairness or prejudice claimed by the defendant is that Mr. Thomas' testimony was harmful to his case. There is no allegation that the substance of the testimony was new, complex, or unanticipated. In fact, it related directly to the prescriptions discussed in the preceding testimony. Given this, as well as the fact that, after being given notice of the new witness, the defendant waited until the next day when the witness was on the stand to object and plead unfair surprise, we do not believe that it was error to permit the testimony.

This conclusion is bolstered by the remaining *Meyers* factors. When given notice, the defendant made no attempt to cure

---

room. If your answer to the foregoing question is 'YES' answer the following question:) "6. What is the amount of damages that will reasonably serve as punitive damages in this case?

$_____."

5. The Virgin Islands Code permits the awarding of attorney's fees to the prevailing party in a civil case as part of his or her costs. *See* V.I. Code Ann. tit. 5, § 541(a)(6), (b) (1967). In this case, the district court awarded $742.00 in costs and $9,878.00 in attorney's fees to the plaintiff.

the alleged surprise or prejudice by seeking a summary of anticipated testimony, by requesting to depose the witness that evening, or by seeking a continuance.[6] Further, there is no indication that permitting the testimony in any way disrupted the orderly and efficient conduct of the trial. In fact, in that Dr. Shira's testimony was taken out of order and Mr. Thomas' related directly to it, the orderly presentation of the case may have been enhanced. Finally, there has been no showing of bad faith on the part of the plaintiff. While the defendant alleges (Br. at 11) that "[t]he surprise presentation of Mr. Thomas was designed by plaintiff for maximum impact," the record clearly shows that the defendant was made aware that he would testify on the first day of trial, almost immediately after the plaintiff had subpoenaed him.

### III.

■ The defendant next argues that the district court abused its discretion in permitting the plaintiff to call a "rebuttal" witness during her case in chief.

It is undisputed that "the mode and order of interrogating witnesses and presenting evidence" is a matter within the discretion of the trial judge. Fed.R.Evid. 611(a). Thus, we have held it to be within the trial court's discretion to permit a defense expert to testify during the plaintiff's case in order to accommodate the schedule of the witness:

"Trial courts in this circuit traditionally have accommodated the schedules of expert witnesses. It would exalt form over substance to require a physician to return to a courtroom at a later date, once he has already appeared for one party. Thus, although calling a defense witness out of turn for reception of his testimony during the plaintiff's case in chief may technically disrupt the normal presentation of the case, this decision is committed to the discretion of the trial court. If convinced that practical reasons justify

calling a witness out of turn and that the testimony will not produce undue confusion in the minds of the jurors, experienced trial courts will permit the practice. If it is the product of an informed discretion, the decision will not be disturbed."

*Lis v. Robert Packer Hospital*, 579 F.2d 819, 823 (3d Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978). This is precisely the accommodation made in this case for the defendant's expert witness, Dr. Shira.

The defendant argues, however, that there is a difference in kind between direct and rebuttal testimony and that the latter is impermissible per se until the defense has had an opportunity to present its entire case. We disagree. Absent a showing of specific prejudice, we do not believe that an expert witness testifying in rebuttal should be entitled to any less accommodation than one testifying in a party's case-in-chief where, as here, the specific defense testimony to be rebutted is already in evidence. Dr. Shira testified that the plaintiff could not have been in severe pain because the defendant had merely prescribed Wygesic, a mild analgesic. Mr. Thomas testified that the plaintiff never presented a prescription for Wygesic, but rather presented a prescription from the defendant for Percodan, a strong pain-killer. Put simply, one witness asserted a fact and the second contradicted it. The factual question was narrow and relatively uncomplicated. We see no possibility of jury confusion or other prejudice to the defendant and, thus, no clear abuse of discretion.

### IV.

The defendant's final contention is that the district court erred in submitting the issue of punitive damages to the jury because the evidence in the record was insufficient to support such an award.

■ Despite the position taken by the plaintiff in her brief and, particularly, at

---

**6.** *See De Laval Turbine, Inc. v. West India Industries, Inc.*, 502 F.2d at 263 n.6 ("any claim of prejudice (surprise) is belied by the fact that Henry Lift's counsel did not request a continuance when Manhoo was called as a witness").

oral argument, we do not believe that the defendant's alleged "abandonment" of her during her post-operative treatment was ever submitted to the jury as a possible basis for awarding punitive damages. First and foremost, the punitive damage jury interrogatory is explicitly limited to the "intentional fraud" and, arguably, battery theories.[7] Second, when the plaintiff sought to question Dr. Hertz about his personal finances as a basis for a punitive damage award, the court overruled the defendant's objection, finding that the plaintiff had alleged sufficient facts to support her fraud theory but specifically held that "abandonment" in this sense had not been shown. N.T. at 389. Third, the transcript of the sidebar conference on the court's proposed points for charge contains a statement by the plaintiff's counsel explicitly disclaiming reliance on any theory other than fraud as a basis for punitive damages.[8] Consequently, the sole issue is whether there was sufficient evidence to support the punitive damage award on this basis.

In the absence of local law to the contrary, the rules of decision in the United States Virgin Islands are "[t]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute...." V.I. Code Ann. tit. 1, § 4 (1967). On the issue of punitive damages, section 908(2) of the Restatement (Second) of Torts provides:

"Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."

Restatement (Second) of Torts § 908(2) (1977). The comments to this section go on to explain:

"Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, *conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.* Although a defendant has inflicted no harm, punitive damages may be awarded because of, and measured by, his wrongful purpose or intent, as when he unsuccessfully makes a murderous assault upon the plaintiff, who suffers only a momentary apprehension. In all these cases, however, a cause of action for the particular tort must exist, at least for nominal damages. Reckless indifference to the rights of others and conscious action in deliberate disregard of them (see § 500) may provide the necessary state of mind to justify punitive damages.

*"Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence."*

(Emphasis added.) We read this language as clearly indicating that the plaintiff relied upon her fraud or battery theory to support the award. Nonetheless, to the extent that the plaintiff did seek punitive damages based on the defendant's alleged refusal to see her on July 8, we find that, as a matter of law, the facts do not rise to the level of "abandonment" or "reckless indifference" required to support an award of punitive damages in a medical malpractice case. *See, e.g.,* Restatement (Second) of Torts § 908(2) (1977); *Medvecz v. Choi,* 569 F.2d 1221, 1227 (3d Cir. 1977) (applying Pennsylvania law).

---

**7.** *See* note 4 above.

**8.** *See* N.T. at 528–29. In arguing for a verdict form similar to that eventually adopted, Mr. Coleman stated:

"Now, I don't think that the punitive damage case has anything really to do with the malpractice case. *The punitive damage case rests solely upon the fact that she wouldn't have submitted if he didn't tell her* [of the possibility of cancer] and therefore that is not necessarily malpractice. If what we say is true, if the jury believes our testimony, they could find that he was guilty of fraud but not guilty of malpractice...."

*Id.* comment b (emphasis added). We do not believe that such a showing has been made on this record.

As is evidenced by the difficulty which the court and the parties encountered in framing the punitive damage interrogatory for the jury (N.T. at 519–33), it is not clear upon precisely what basis the plaintiff rested her punitive damage claim. Rather than the usual informed consent claim that the defendant failed to disclose a material risk, this case involves a claim that consent was based on the wrongful disclosure of a risk that did not exist. As a result, it appears, though it is not entirely clear, that the plaintiff's claim is based simply upon fraud or the theory that the fraud vitiated the plaintiff's consent resulting in a battery. While, on its face, the jury interrogatory focuses on the former theory, the gist of the plaintiff's argument in support of the interrogatory language reflects the latter approach (N.T. at 527–30). After a careful analysis of the entire trial record, we conclude that there is insufficient evidence to support a punitive damage award under either theory.

## A.

██ Under the principles of the Restatement (Second) set forth above, the jury would have to find that the defendant made an intentionally fraudulent—rather than simply negligent—misrepresentation. The Restatement (Second) provides:

"§ 526. Conditions Under Which Misrepresentation Is Fraudulent (Scienter)

"A misrepresentation is fraudulent if the maker

"(a) knows or believes that the matter is not as he represents it to be,

"(b) does not have the confidence in the accuracy of his representation that he states or implies, or

"(c) knows that he does not have the basis for his representation that he states or implies."

Restatement (Second) of Torts § 526 (1976). Thus, the jury would first have to find that the defendant in fact told the plaintiff without qualification that there was a 9% chance of cancer developing.[9] On appeal, we must assume that the jury did so. Next, under the rule of the Restatement, the jury would have to find that the defendant knew or believed his representation to be false, had no confidence in its accuracy, or knew he had no basis for his statement. The only evidence which could be said to support such a conclusion is the testimony of Dr. Prudoff, the plaintiff's expert, that "I don't believe that there is any basis for making the statement that a patient, if you don't have a wisdom tooth, impacted wisdom tooth removed, that you're going to get cancer." N.T. at 206. However, considering the evidence most favorable to the plaintiff, Dr. Hertz never stated that cancer would develop, only that it could. The nub of the dispute is over the degree of probability. Further, when questioned about a percentage chance of cancer developing, Dr. Prudoff simply stated: "There is no reported percentage." N.T. at 208. In addition, all of Dr. Prudoff's testimony was in answer to the question: "In your opinion, does that kind of advice deviate—to give that advice, would that be a deviation from the standard of good dentistry?" N.T. at 206. In other words, Dr. Prudoff was asked whether he though that Dr. Hertz had been negligent. The record makes clear that all of the expert witnesses agreed that there was some chance of cancer but disagreed on its degree and the point at which it should be disclosed to the patient. This is a question of professional judgment—which, if in error, may be negligence but is generally insufficient upon which to base punitive damages. In our view, it does not resemble intentional fraud in the criminal sense, *see, e.g.,* V.I. Code tit.

9. If the jury were to accept Dr. Hertz's testimony that he estimated the chance to be .09% and qualified it by saying that "even a one in a million chance is too high," it is beyond question that the evidence would not support the necessary finding that he knew his statement to be false or knew he had no basis for it. All of the witnesses agreed that there is a basis for believing there was some chance of cancer and differed simply on the degree of probability and the point at which it should be disclosed to a patient.

14, § 834 (1964) (obtaining money by false pretense), and there is insufficient evidence to support a conclusion that Dr. Hertz knew it to be false or knew there was no basis for it. All that this record shows is a difference of medical opinion on the degree of the cancer risk. This is insufficient support for an award of punitive damages.

### B.

■ Having decided that punitive damages are not supported by an intentional fraud theory, the question becomes whether the defendant made a negligent misrepresentation which vitiated the plaintiff's consent, thus allowing punitive damages on a battery theory. This approach is disfavored by modern courts because it muddles negligence and intentional tort principles which have historically been kept separate and distinct. *See* Comment, *Informed Consent in Medical Malpractice*, 55 Calif.L.Rev. 1396, 1400 n.18 (1967). Thus, the battery theory generally has been reserved for those cases where the physician ignores the patient's request for an explanation and operates on the basis of a blanket consent signed at the time of admission, *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966), where the doctor operates on the wrong part of the body, or acts viciously or maliciously. *See* Comment, 55 Calif.L.Rev. at 1400 n.18. Where the question is whether the physician has given the patient sufficient information upon which to base an informed decision or whether a particular risk should have been disclosed, most courts now restrict a plaintiff to a negligence theory. *See, e.g., Cobbs v. Grant*, 8 Cal.3d 229, 502 P.2d 1, 104 Cal.Rptr. 505 (1972); *Perin v. Hayne*, 210 N.W.2d 609 (Iowa 1973); *Downer v. Veilleux*, 322 A.2d 82 (Me.1974); *Trogun v. Fruchtman*, 58 Wis.2d 569, 207 N.W.2d 297 (1973). We believe that this rule should apply here.

■ As evidenced by the disputes between the expert witnesses, the underlying medical issue here—the possibility of cancer of the jaw resulting from an impacted wisdom tooth—is one on which reasonable minds could, and do, differ. When one mind differs to the extent that other medical experts consider it to be unreasonable, there is a basis for finding negligence. There is not, however, the sort of tortious action contemplated in a common law battery.[10] We find support for this view in the comments to the battery provisions of the Restatement (Second) which speak of a battery occurring in this context only where there are "*fraudulent misrepresentations* which induce the other to give the consent...." Restatement (Second) of Torts § 18, comment f (1965) (emphasis added). As noted in part IV–A above, we do not believe that the evidence in this case supports a finding of intentional fraud by Dr. Hertz but, rather, discloses a dispute over his judgment.

Thus, we do not believe that a case for punitive damages was made out and we must, therefore, reverse that part of the district court's judgment.

### V.

■ Because the reasonableness of the award of attorney's fees is measured in part by its relationship to the amount of compensatory damages recovered and because we have no indication on this record of what portion of the attorney's fees awarded, if any, are attributable to the claim for punitive damages, we will vacate the attorney's fee award and remand the case to the district court for a reconsideration of reasonable attorney's fees in light of this opinion.

### VI.

For the foregoing reasons, the judgment of the district court awarding punitive dam-

---

**10.** In addition, if the policy behind the battery theory is that a patient has the right to be told of all known, material risks before being asked to consent, it seems somewhat anomalous to expose a doctor to a battery claim—and the possibility of punitive damages—for disclosing a known risk where his error, if any, is in negligently overstating its probability. Thus, we are not persuaded by the argument that there has been a "technical battery" entitling the plaintiff to go to the jury on the issue of punitive damages even without a showing of evil purpose or reckless indifference on the part of the defendant.

ages to the plaintiff will be reversed and the district court instructed to enter judgment for the defendant on that claim. Also, the award of attorney's fees to the plaintiff will be vacated and the district court instructed to reconsider the award of reasonable attorney's fees in light of this opinion. *See* 28 U.S.C. § 2106 (1976). In all other respects, the judgment of the district court will be affirmed.